Edward ECKER, Plaintiff,

v.

Peter COHALAN, County Executive of the County of Suffolk, John Chester, Commissioner of Parks, Recreation and Conservation for the County of Suffolk, and the County of Suffolk, Defendants.

No. CV–80–1848(JBW).

United States District Court,
E. D. New York.

July 8, 1982.

Patrick A. Sweeney, Smithtown, N. Y., for plaintiff.

David J. Gilmartin, Suffolk County Atty., Hauppauge, N. Y. by Martin Bradley Ashare, Patchogue, N. Y., for defendants.

## MEMORANDUM AND ORDER

WEINSTEIN, Chief Judge.

Plaintiff, formerly Chief Deputy Commissioner of Parks, Conservation and Recreation for Suffolk County, claims that he was dismissed for political reasons in violation of the First and Fourteenth Amendments. 42 U.S.C. § 1983. He seeks reinstatement, back pay and benefits, and other compensatory damages from the County, the County Executive, and the County Commissioner of Parks. For the reasons indicated below, the suit must be dismissed as frivolous.

FACTS

I. The Nature of the Position

Under the Suffolk County Charter, the Commissioner of Parks is empowered to appoint and to dismiss the Deputy Commissioner of Parks. Suffolk County Charter, Art. 28, § 2801(b). The Commissioner of Parks serves under the direction of the County Executive. Suffolk County Local Law No. 7, 1981.

The Deputy Commissioner possesses "the powers" and may "perform the duties and act generally for and in place of the Commissioner." Suffolk County Charter Art. 28, § 2804. At the time of his dismissal, plaintiff's salary was over $36,000.00 a year, one of the highest paid by the County.

As Deputy Commissioner, plaintiff was delegated primary responsibility for personnel, vehicles, insurance and the park rangers service. He represented the Parks Department at meetings of the Public Safety Committee of the County Legislature, at employee grievance and disciplinary hearings, and at any other hearings that the Commissioner was unable to attend. In addition, he regularly was present at meetings of the Board of Trustees of Parks, Recreation and Conservation, and monthly conferences with the Commissioner and Superintendent at which department policy was often set.

Though head of personnel for the Parks Department, plaintiff had limited discretion over hiring and promotion of permanent employees, since these were largely civil service positions. He did, however, have primary responsibility for the selection of summer employees, numbering approximately 400, subject to recommendations of the Republican Party town leaders of the County. The party leadership to which plaintiff answered for his performance of this function was one in which he held a prominent place. Plaintiff was himself a Town Committeeman and from 1977 to 1979 was East Hampton Town Leader. In addition, he was a long time protégé of former State Assembly Speaker Perry Duryea, then a powerful figure in Suffolk County Republican politics.

Subsequent to plaintiff's discharge, he sought unemployment benefits. These were denied on the basis of an administrative finding by an insurance referee for the New York State Department of Labor that plaintiff was ineligible because he had occupied a "major non-tenured policymaking position." N.Y. Unemployment Insurance Law § 565.2.

II. Plaintiff's Discharge

Plaintiff was appointed Deputy Commissioner of Parks in 1967. From 1969 to 1974, he simultaneously was a legislative assistant to the State Assembly Speaker. When, in 1974, defendant John Chester became Commissioner of Parks, he directed plaintiff to give up the legislative position and plaintiff did so. In 1975 Chester named plaintiff Chief Deputy Commissioner of Parks. In 1977 plaintiff became the sole Deputy Commissioner, retaining his title of Chief Deputy.

During the 1979 campaign for County Executive, defendant Peter Cohalan challenged incumbent John Klein for the Republican Party nomination. Plaintiff actively supported Klein against Cohalan. At the June nominating convention, heated words were exchanged between plaintiff and Cohalan. After his election as County Executive, Cohalan directed John Chester

to replace plaintiff with Henry Berger and this order was carried out. Moreover, Cohalan blocked attempts to place plaintiff on the County payroll in a lesser capacity so that his pension could vest.

### III. Relative Qualifications of Plaintiff and of His Replacement

Prior to his appointment as Deputy Commissioner of Parks in 1967, plaintiff had served as a probation officer (1954–1959), Deputy County Coordinator (1959), Deputy Commissioner of Jurors (1960–1961), Commissioner of Jurors (1961–1963), Town Supervisor of East Hampton (1964–1967), and Research Assistant to the New York State Constitutional Convention (1967). From 1969 to 1974, as already noted, he was a state compensated Consultant to State Assembly Speaker, Perry Duryea. Each of these positions was obtained through the Suffolk County Republican Leadership, largely on the recommendation of Perry Duryea.

Plaintiff has no college degree and no formal training in any area of parks management. His political experience, by contrast, is extensive. He was a Republican County Committeeman throughout much of his employment history. From 1977 to 1979 he was East Hampton Town Leader and served on the Executive Committee of the Suffolk County Republican Committee. During his tenure as Deputy Commissioner of Parks, plaintiff devoted extensive time to political commitments outside the county as well. From 1969 to 1974 he assisted Perry Duryea in Albany, often several days a week. In 1978 he took a six month leave of absence to assist Duryea in his unsuccessful gubernatorial campaign and its aftermath.

As Deputy Commissioner of Parks plaintiff's performance was unspectacular. Defendant John Chester, plaintiff's immediate superior in the Parks Department from 1974 to 1980, testified that plaintiff continued to devote much of his time to his political responsibilities even after giving up his position in Albany; that he was incapable of providing the Commissioner with needed assistance in preparing the department's budget; that he frequently exceeded budget allocations for personnel; that he failed to perform tasks assigned to him; that he could not perform day-to-day administrative tasks; and that he did not follow directions. Transcript pp. 315–317, 324, 337. Chester, nevertheless, had retained Ecker as Deputy Commissioner during the Klein regime because he feared the political consequences of firing him; Ecker was his "political superior." Transcript p. 317.

Henry Berger, the replacement, has a Masters Degree in recreation and parks administration and he is currently pursuing doctoral studies in the same field. In his capacity as Vice President of a management consulting firm, he had advised the Town of Islip (of which Cohalan was then Town Supervisor) on recreation services. On the basis of Berger's performance, Cohalan appointed him Commissioner of Parks for Islip. Berger had had no affiliation with the Republican Party. As Deputy Commissioner of Parks for the County, Berger has performed far better than did plaintiff. Transcript p. 280. For example, unlike plaintiff, he has been able to assist the Commissioner in preparing budgets. Transcript pp. 337–338.

### IV. Political Context of the Discharge

Cohalan's campaign for County Executive was based on an attack on the then reigning Republican leadership of Suffolk County. He accused this leadership of corruption, and unresponsiveness to popular needs. He pledged to make "a clean sweep," ridding County government of political "hacks" (Defense Exhibit Q), and replacing them with creative policymakers and competent administrators. At trial, Cohalan testified:

> When I ran for County Executive, I ran on a platform that I would bring in a new team, a clean sweep, get rid of the Old Guard Republicans who I feel brought the county to its knees, and I wanted to get rid of the whole Schwenk apparatus and in order to do that I had to replace people who represented the old

wing of the party and who were actively involved in top policy-making positions in the county where they could do me harm if they wish with my own people, especially where my own people were professionally qualified.

Transcript pp. 264–265.

To fulfill these campaign pledges, he identified approximately 150 positions involving the making, implementing or explaining of policy. Transcript pp. 260–261. These positions are now in part filled by Democrats or Republican opponents, who Cohalan believed "were experts in their positions and ... better than anybody [he] interviewed who might want their jobs." Transcript pp. 279–280. Cohalan identified the Deputy Commissioner of Parks as one of these key jobs. He characterized plaintiff as a member of the Republican Party "Old Guard" that he had pledged during his campaign he would sweep from power in the County. "I felt very strongly," he testified, that "Ecker ... was not on my team. He was one of the Republican old guard in Suffolk County who I thought brought the County party to its knees and didn't give the taxpayers in our County good government." Transcript p. 268.

> Cohalan characterized plaintiff as:
> part and parcel of the policymaking procedures of the county—because under the old regime, our party often set policy and Ecker wore the hat of town leader of East Hampton and was also one of Perry Duryea's counsels in Albany and also, he was the Deputy Commissioner of Parks and, therefore, he had both de facto power and [de jure] power. (transcript p. 273; see also p. 282). . . .
> In a way, he was the equivalent of what they have in Russia where Chester was the governmental head and Mr. Ecker was the party head.

Transcript p. 276; see also pp. 298, 299.

> I wanted to hire people based on professionalism and I wanted people loyal to me and I felt very strongly that if Mr. Ecker stayed in his position ... it would be a real slap in the face to the people who supported and worked for me and whose cause I felt I was championing when I said I was going to have a new broom sweep clean . . .

Transcript p. 268. As part of this program, Cohalan replaced some 30 County officials.

There was substantial basis for the view that even after the election plaintiff would attempt to frustrate the new County Executive's plan to obtain a new and more compatible Republican party leadership. Ecker joined with various other Republican leaders in issuing a statement to the press objecting to the new County leader's "rewarding defeated Democrats with high salaried patronage" and calling this "an insult to loyal, hard working Republicans." Defense Exhibit 00. At trial Ecker denied responsibility for this statement but gave the following testimony:

THE COURT: Supposing Cohalan ... had told Chester ... to appoint in your place ... the Democratic leader of Huntington. Would you have been shocked?

THE WITNESS: Certainly.

THE COURT: Why?

THE WITNESS: Let me explain—can I explain the politics of it?

THE COURT: That's what this case is all about and I'm trying to understand it.

THE WITNESS: We had many primary fights in Suffolk County and I've been on the right and wrong side and they were always able to put things back together and this one they couldn't.

Maybe if I had thought about it I would have taken a different tack but I thought we were all in the same party as of November of 1979.

I find out that maybe we were not all in the same party.

I would have been shocked. In fact, I was very shocked, Judge, when I got the word I was fired for any reason.

THE COURT: You would have been shocked if he put a Democrat in there.

THE WITNESS: He's done that.

THE COURT: But that is a Republican slot really.

THE WITNESS: Oh, yes.

I know if Commissioner Chester's term ended when the Democrats had control of the legislature we'd both have been gone.

I'm not knocking that. . . .

THE COURT: So isn't it really a political job and ... high level jobs have to respond to the administration in power, whatever the administration. . . .?

THE WITNESS: But when a Republican fires another Republican . . . .

Transcript pp. 136–138.

Defendants were candid in admitting that politics as well as governmental efficiency were factors in the dismissal. In a letter of recommendation for prospective employers, Chester wrote: "The termination of Mr. Ecker's employment with this department had nothing whatsoever to do with his personal ability but was purely politically motivated." Plaintiff's Exhibit B. Cohalan testified that he directed that Ecker be fired because, among other reasons, he was a "sworn political enemy" who would "do [him] in" (transcript, p. 264), that he was part of the "Old Guard of the Party," (transcript, p. 251), and that he "didn't trust Ed Ecker. It's as simple as that." Transcript, p. 270. On the other hand, Chester testified that he had wanted someone "capable of performing the day-to-day administrative functions" of the department, a capacity Ecker lacked (transcript, pp. 320, 324) and Cohalan told the court that he considered plaintiff incompetent and would have discharged him for that reason even had he not considered Ecker untrustworthy. Transcript pp. 265, 285, 298.

LAW

■ State action is established. 42 U.S.C. § 1983. Defendant Chester dismissed plaintiff in his capacity as County Commissioner of Parks acting at the direction of the County Executive. The question is whether plaintiff's discharge violated his rights of free speech and association as recently defined in *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980).

### I. First Amendment's Limitations on the Discharge of Public Employees

If plaintiff establishes that a discharge was caused by political activity, defendant may demonstrate 1) that the plaintiff would, in any event, have been discharged for other reasons, or 2) that political considerations are appropriate criteria for the job. *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979); *Nekolny v. Painter,* 653 F.2d 1164, 1167–1168 (7th Cir. 1981); *Barrett v. Thomas,* 649 F.2d 1193 (5th Cir. 1981); *Tanner v. McCall,* 625 F.2d 1183 (5th Cir. 1980), *cert. denied,* 451 U.S. 907, 101 S.Ct. 1975, 68 L.Ed.2d 295 (1981); *Gibbons v. Bond,* 523 F.Supp. 843 (W.D.Mo.1981), *aff'd,* 668 F.2d 967 (8th Cir. 1982).

There is no need to determine in this case what the predominant motive was for the discharge—the ultimate purpose animating governmental decisions is notoriously difficult to determine. *See, e.g., United States v. Schipani,* 289 F.Supp. 43, 64 (E.D.N.Y. 1968), *subsequent conviction aff'd,* 414 F.2d 1262 (2d Cir. 1969); Ely, Legislative and Administrative Motivation in Constitutional Law, 79 Yale L.J. 1205, 1212–1223 (1970); Note, "Free Speech and Impermissible Motive in Dismissal of Public Employees" 89 Yale L.J. 376, 395–6 (1979). When the court is required to speculate on what an administrator would have done had he not had the intent that he did, the problem becomes more difficult still. 89 Yale L.J., *supra* at p. 389 (criticizing *Mt. Healthy* as requiring an "entirely hypothetical" inquiry).

In the case before the court, any inquiry about whether plaintiff would have been fired if his politics were right is particularly unrewarding because politics and efficiency were so intertwined. It is impossible to determine whether plaintiff would have retained his position but for his political affiliations because but for his political affiliations he would never have attained or kept the job.

It may be necessary in some cases to base a judgment on speculation about motive, but such decisions are of little precedential value. One of the chief mischiefs addressed by the *Elrod* and *Branti* cases is the general inhibiting effect of political discharges on exercise of First Amendment rights by public employees. *Elrod*, 96 S.Ct. at 2680–81; *Branti*, 100 S.Ct. at 1293–94. This restraint is unnecessarily magnified when public employees remain in doubt as to which positions are subject to the protection of the First Amendment and which are not. Similarly, lack of notice as to the scope of First Amendment protection of public employees hinders elected officials seeking to exercise their legitimate powers through the control of personnel. Thus, where a genuine question exists as to whether political considerations may be used as qualifications for particular positions, it is preferable that the court confront the issue directly without deciding the preliminary question of motive. *See Bavoso v. Harding*, 507 F.Supp. 313 (S.D.N.Y.1980), denying a request for a preliminary injunction barring plaintiff's discharge. The court determined that political affiliation was an appropriate criterion for selecting a City Corporation Council, even though "it [was] impossible to determine why plaintiff was rejected ..., whether that rejection was based on political affiliation or professional ineptitude." Id. at 316.

## II. Propriety of Considering Political Affiliation

There is no simple standard for determining what positions in local government may be legitimately staffed on a partisan basis. In the swing opinion of the Supreme Court in *Elrod*, Justice Stewart limited the scope of First Amendment Protection to "nonconfidential" and "nonpolicymaking" positions, 96 S.Ct. 2673, 2690 (1976). Justice Stevens, writing for the majority in *Branti v. Finkel*, found this standard both under-inclusive and over-inclusive: too narrow because officials who implement or explain policy made by others might appropriately be selected on a political basis; too broad because some policy making public employees

—e.g., football coaches and public defenders—are not expected to represent the electorate. "In sum," wrote Justice Stevens, "the ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public officer involved." 100 S.Ct. at 1295.

The American system puts government in the ultimate control of the voters. It requires elected officials to delegate authority to those they can trust in effectuating policy that the electorate arguably mandates. As Judge Swygert wrote in *Nekolny v. Painter*, the

> ability of the government to implement the will of the people is fundamental to our system of representative democracy. We recognize that policymaking and policy implementation may occur at many levels even within a particular office whose sphere of authority is narrowly circumscribed. The test is whether the position held by the individual authorizes, directly or indirectly, meaningful input into government decisionmaking on issues where there is room for principled disagreement on goals or their implementation.

653 F.2d 1164, 1170 (7th Cir., 1981). *See also Elrod* 96 S.Ct. at 2687; *Illinois State Employees Union v. Lewis*, 473 F.2d 561, 574 (7th Cir. 1972) (Stevens, J.), *Cert. denied*, 410 U.S. 928, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973).

Whether any particular non-elective position in government serves this function of responding relatively directly to the voters requires some practical sense for the political-governmental system in operation. Among the indicia that locate a job along the spectrum between policymaker and clerk are: relative pay, technical competence, power to control others, authority to speak in the name of policymakers, public perception, influence on programs, contact with elected officials and responsiveness to partisan politics and political leaders. In all

these respects, plaintiff was a politician making policy in a political job.

Plaintiff was one of the highest paid officials in the county, a fact "tending to signify a position of some influence." *Nekolny v. Painter*, 653 F.2d 1164, 1170 (1981). He participated in numerous meetings at which department policy was discussed and he explained the position of the Department at employee grievance hearings. "That he did not have final decision making authority is not determinative." Id. at 1170; *Indiana State Employees Association, Inc. v. Negley*, 365 F.Supp. 225 (S.D.Ind.1973), aff'd, 501 F.2d 1239 (7th Cir. 1974). Plaintiff was not, like the successful plaintiff in *Barrett v. Thomas*, only one of several hundred deputies to a policymaking official. 649 F.2d 1193, 1201 (5th Cir., 1981). Rather, he was the sole deputy, statutorily charged to serve as the Commissioner's alter ego, like the unsuccessful plaintiff in *Newcomb v. Brennan*, 558 F.2d 825, 829–830 (7th Cir.), Cert. denied, 434 U.S. 968, 98 S.Ct. 513, 54 L.Ed.2d 455 (1977). *See also Owens v. Rush*, 654 F.2d 1370, 1381 (Barrett, J., dissent) (10th Cir., 1981). For politicians, he was the person to see in the department. Under these circumstances, the fact that plaintiff was "an employee with responsibilities that are not well defined or are of broad scope" means that he "more likely function[ed] in a policymaking position." *Elrod v. Burns*, 96 S.Ct. 2673, 2687 (1976).

Moreover, there was one area, involving both policymaking and confidentiality in which plaintiff was answerable to no one in the department—that of personnel. That his policies in this sphere were dictated by the interests of the Republican Party indicates more rather than less policymaking authority within the department. In this area he was the Commissioner's superior because he was more powerful than the Commissioner in the Republican Party. When he acted on the wishes of a Republican leader in making hiring decisions, moreover, he was not so much taking orders as trading favors with an equal.

Even accepting plaintiff's characterization of his role in the department as that of a highly paid clerk, plaintiff was clearly in a position to influence policy in the County by virtue of his office. It is apparent that detailed County government policy and execution of that policy through appointments and otherwise was determined by the leadership of the Republican Party as well as by the executive branch. Plaintiff was a powerful figure in that leadership. He substantially functioned as a full time political operative while being maintained at a high rate of pay by the County and while placing the resources of the County at the disposal of his political allies. He received "appointment . . . in exchange for the delivery of votes or other party service, not job capability," *Elrod v. Burns* 96 S.Ct. at 2685, so "that governmental favor [could] be channeled through political connections," *United Public Workers v. Mitchell*, 330 U.S. 75, 98, 67 S.Ct. 556, 569, 91 L.Ed.2d 754 (1947), and "the electoral process [tipped] in favor of the incumbent party." *Elrod v. Burns* 96 S.Ct. at 2681.

■ Prior to *Elrod v. Burns*, courts frequently suggested that beneficiaries of patronage should be barred from recovery for patronage firings. *Nunnery v. Barber*, 503 F.2d 1349, 1359, 1360 (4th Cir. 1974), Cert. denied, 420 U.S. 1005, 95 S.Ct. 1448, 43 L.Ed. 763 (1975); *Illinois State Employees' Union Council 34 v. Lewis*, 473 F.2d 561, 573 (1972); *A.F.L. v. Shapp*, 443 Pa. 527, 280 A.2d 375 (1971). In the wake of *Elrod*, competent non-policymaking employees may not be discharged merely because their positions were acquired through patronage. When, however, an employee is in a position to dispense patronage, it is legitimate to take into account his propensity to do so. Thus, in *Aufiero v. Clarke*, 489 F.Supp. 650 (D.Mass.), aff'd, 639 F.2d 49 (1920), Cert. denied, 452 U.S. 917, 101 S.Ct. 3052, 69 L.Ed.2d 421 (1981), the court noted that

The plaintiff was not fired because of his beliefs or association but because of his position in the prior administration. That position was related to his political association, i.e. patronage appointments, and might well be deemed protected if it did not involve the very conduct that was

itself condemned in *Elrod v. Burns* and *Branti v. Finkel.* It is doubtful if even under those cases the same conduct can be both constitutionally condemned and constitutionally protected.

Id. at 653.

Though rarely lauded in party platforms and political speeches, patronage is a policy; the decisions whether to dispense it and how are policy decisions; and the patronage dispenser is among the most powerful of our political sachems. Failure to recognize this fact of political life would yield the paradoxical result that in attempting to curtail future patronage, the courts had merely entrenched existing patronage systems.

██ It is not necessary that defendant show that plaintiff actually functioned in a policymaking capacity in order to justify his use of political affiliation as a qualification for the position in question. It is sufficient that defendant show he is legally empowered to delegate his own authority to the occupant of this position and intends to do so. The Third Circuit noted in *Ness v. Marshall* that

> The allegation that the plaintiffs' role in the former Mayor's administration may in fact have been highly constricted does not affect our conclusion. Under the Administrative Code, it is contemplated that a mayor might rely upon the City Solicitors for the legal advice necessary to implement policy. That one mayor may have chosen not to employ the solicitors in this manner should not stand as a bar to future mayors relying on solicitors to the extent allowed by the Code.

660 F.2d 517, 522 (1981).

██ Plaintiff's replacement, Henry Berger, has in fact undertaken critical policymaking functions within the Parks Department, greater than those exercised by plaintiff particularly in fiscal planning. Testimony at trial suggested that plaintiff did little in this area because of his own inadequacies, rather than because he was not authorized. There is certainly nothing in the County Charter to prevent the County Executive from using the Deputy Commis-

sioner of Parks in this way. Given his manifest intent to do so, it was appropriate for the County Executive to employ political criteria in selecting the Deputy Commissioner of Parks. From the standpoint of every conceivable criterion—plaintiff's role as Deputy Commissioner, his successor's role, the statutory definition of the job, and the intentions of the defendant—the choice of a Deputy Commissioner of Parks was a major political appointment, for which political affiliation or its absence was an appropriate criterion.

### III. Attorney's Fees

██ Under these circumstances, a claim for deprivation of First Amendment Rights is frivolous. It appears in part to have been motivated by a desire to generate publicity adverse to a political opponent. As such it is deliberately vexatious and meets the standards for an award of attorney's fees against plaintiff. 42 U.S.C. § 1988. *See* e.g., *Christiansburg Garment Co. v. E.E.O.C.*, 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978); *Faraci v. Hickey-Freeman Co., Inc.*, 607 F.2d 1025 (2d Cir. 1979); *Carrion v. Yeshiva University*, 535 F.2d 722 (2d Cir. 1976); *Warren v. Applebaum*, 526 F.Supp. 586, 588 (E.D.N.Y.1981).

### CONCLUSION

Politics is and should be a serious matter in this country. On its vitality depends the effectiveness of our government and the welfare of our people. Plaintiff undoubtedly paid a heavy price for favoring the losing side in a bitter internecine struggle for the control of Suffolk County's governing party. Some may be cautioned by his experience to mute the exercise of their First Amendment rights; but the free speech rights of public employees must be weighed against the right of the electorate to designate the people and the policies that will hold sway over government. Where the two come into conflict, the law must favor popular sovereignty. Where First Amendment rights are invoked to prevent elected officials from delegating their mandates, they retard rather than advance representa-

tive democracy. The facts of this case, involving the replacement of a powerful professional politician in the role of policy-maker and patronage dispenser in County government, require a finding that the First Amendment was not violated.

Judgment for defendants with costs and disbursements. Unless the parties agree on appropriate attorney's fees or waive them, defendants shall move for filing of fees within thirty (30) days.

So Ordered.