568 F.Supp. 1406 (1983)
Shirley BARNES, Frances J. McElroy and Murrell Thomas, Plaintiffs,
v.
Freeman (Teek) BOSLEY, Jr., Clerk, Circuit Court, City of St. Louis, and Paula Carter, Deputy Circuit Clerk, City of St. Louis, Defendants.
No. 83-53C(2).
United States District Court, E.D. Missouri, E.D.
July 27, 1983.
*1407 *1408 Charles R. Oldham, Thomas Bauer, St. Louis, Mo., for plaintiffs.
Lloyd J. Jordan, St. Louis, Mo., for defendants.

MEMORANDUM
FILIPPINE, District Judge.
This matter is before the Court for a decision on the merits of plaintiffs' complaint following a trial before the Court. By agreement of the parties, the hearing on plaintiffs' request for a preliminary injunction was consolidated with the trial on the merits of plaintiffs' complaint. Fed.R. Civ.P. 65(a)(2). After consideration of the testimony and exhibits introduced at trial, the parties' briefs, and the applicable law, the Court enters the following memorandum opinion which it adopts as its findings of fact and conclusions of law, pursuant to Fed.R.Civ.P. 52(a).
This action arises out of the dismissals of plaintiffs as employees in the Clerk's Office of the Circuit Court of the City of St. Louis (Clerk's Office). Their termination followed a change in the administration of the Clerk's Office after Freeman Bosley, Jr., had defeated incumbent Joseph P. Roddy in the Democratic primary for the office of Circuit Court Clerk. Plaintiffs, all of whom had supported Mr. Roddy in the Democratic primary, brought this action after they had been terminated by Mr. Bosley, alleging that the dismissals violated plaintiffs' First, Fifth, and Fourteenth Amendment rights;[1] plaintiffs also alleged a conspiracy on the part of defendants to violate plaintiffs' civil rights in violation of 42 U.S.C. §§ 1985, 1986. Plaintiffs seek declaratory and injunctive relief, compensatory and punitive damages, and attorneys' fees.

I. First Amendment

Plaintiffs' claims under the First Amendment, as applied to the states under the Fourteenth Amendment, Gitlow v. New York, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1925), are premised on the Supreme Court's decisions in Elrod v. Burns, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) and Branti v. Finkel, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980) which prohibit a state actor from firing a public employee because of that employee's political beliefs. Plaintiffs allege that the newly elected Circuit Clerk, Freeman Bosley, Jr., terminated plaintiffs because they had been supporters of Bosley's primary opponent, Joseph Roddy. Defendants contend that the firings were not politically motivated and that even if the decisions to dismiss plaintiffs would be deemed political, plaintiffs cannot here prevail because they were all policymaking and/or confidential employees.
The Supreme Court in Elrod and Branti established[2] the doctrine that public employees cannot be fired on account of their political beliefs. Those decisions recognized the sanctity that the First Amendment's protections are accorded in our constitutional scheme. None can deny the importance in our democracy of the values and interests that the First Amendment seeks to protect. Not only does the Amendment protect citizens' freedom of belief and association, Sweezy v. New Hampshire, 354 U.S. 234, 250, 77 S.Ct. 1203, 1211, 1 L.Ed.2d 1311 (1957), but also their freedom of nonassociation, Abood v. Detroit Bd. of Educ., 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), and their right to know. Stanley v. Georgia, 394 U.S. 557, 564, 89 S.Ct. 1243, 1247, 22 L.Ed.2d 542 (1969). As put most eloquently by Justice Brandeis in Whitney v. California, 274 U.S. 357, 375-76, 47 S.Ct. 641, 648, 71 L.Ed. 1095 (1926):

*1409 Those who won our independence believed that the final end of the State was to make men free to develop their faculties; and that in its government the deliberative forces should prevail over the arbitrary. They valued liberty both as an end and as a means. They believed liberty to be the secret of happiness and courage to be the secret of liberty. They believed that freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth; that without free speech and assembly discussions would be futile; that with them, discussion affords ordinarily adequate protection against the dissemination of noxious doctrine; that the greatest menace to freedom is an inert people; that public discussion is a political duty; and that this should be a fundamental principle of the American Government. They recognized the risks to which all human institutions are subject. But they knew that order cannot be secured merely through fear of punishment for its infraction; that it is hazardous to discourage thought, hope and imagination; that fear breeds repression; that repression breeds hate; that hate menaces stable government; that the path of safety lies in the opportunity to discuss freely supposed grievances and proposed remedies; and that the fitting remedy for evil counsels is good ones. Believing in the power of reason as applied through public discussion, they eschewed silence coerced by lawthe argument of force in its worst form. Recognizing the occasional tyrannies of governing majorities, they amended the Constitution so that free speech and assembly should be guaranteed.
(Brandeis, J., concurring) (footnote omitted).
Recognizing the tension between efficient government, the demands of the patronage system, and the First Amendment rights of public employees, the Court in Elrod held that nonconfidential and nonpolicymaking employees of the Cook County, Illinois Sheriff's Office could not be discharged when the sole reason for their dismissal was their political affiliation. 427 U.S. at 367-68, 96 S.Ct. at 2686-87. In Branti, however, the Court stated that in patronage dismissal cases "the ultimate inquiry is not whether the label `policymaker' or `confidential' fits a particular position; rather the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." 445 U.S. at 518, 100 S.Ct. at 1294. Thus, although defendants argue for the continued vitality of the "policymaking-confidential" test, the Court's rather unequivocal language in Branti would appear to signal a switch to an appropriateness of political affiliation requirement approach. See Sweeney v. Bond, 669 F.2d 542, 546 (8th Cir.1982) (Court adopts and applies the "appropriateness of party affiliation requirement" analysis).
Thus, under the law as it exists today, plaintiffs must make out a prima facie case by proving that political reasons were the sole motivating factor behind their discharge.[3] The burden of going forward with evidence then shifts to defendants who may show 1) that plaintiffs would have been discharged in any event for other reasons, or 2) that political affiliation is an appropriate requirement for plaintiffs' former positions. *1410 See Ecker v. Cohalan, 542 F.Supp. 896, 900 (E.D.N.Y.1982).

a) Motivation for Discharge

The Court's review of the record in this matter leads convincingly to the conclusion that plaintiffs were discharged solely for political reasons. First, plaintiffs were discharged three days after defendant Bosley had been sworn in and on the second working day of Bosley's administration. Second, defendant Bosley wrote to Judge Gaertner of the Circuit Court on December 28, 1982, regarding the potential discharge of plaintiffs (although they were unnamed in the letter) before Bosley's transition team had interviewed several of the plaintiffs. Plaintiffs' Exhibit 43. This belies defendants' assertion that the decision to terminate plaintiffs was made only after an examination of plaintiffs' qualifications. Third, the interviews that were conducted with plaintiffs Barnes and McElroy did not touch to any significant extent upon plaintiffs' qualifications, job histories, or like factors. Plaintiffs' Exhibit 42A, B. Fourth, it was well known to all that plaintiffs were very close political affiliates of Joseph Roddy. Fifth, defendant Bosley's termination letters to plaintiffs McElroy and Barnes stated they were being fired from their "policymaking and/or confidential position[s]." This indicates that defendants knew and recognized that they were firing plaintiffs for political reasons because of defendants' inclusion of the Elrod-excepted language. Last, defendant Bosley made several public statements immediately following his election that he had the desire and the right to bring "his own team" to the Circuit Clerk's Office. After consideration of all these factors, the Court believes plaintiffs have demonstrated that they were discharged solely for political reasons.[4]

b) Other Reasons for Discharge

At trial defendants attempted to prove that plaintiffs were incompetent to perform adequately the duties of their respective positions. Defendants obviously did so in order to demonstrate that plaintiffs were or would have been discharged from their jobs for reasons unrelated to their political affiliation. Defendants presented the testimony of Freeman Bosley, Jr. that in his estimation plaintiffs were lacking in the appropriate skills, knowledge, and education. Defendant Bosley also testified that his campaign pledge was to bring better management to the Circuit Clerk's Office and that he felt the replacement of plaintiffs was essential for the realization of this goal. Defendants also presented testimony on the generally good qualifications of the people which defendants put in plaintiffs' former positions.
The Court finds that the weight of the credible evidence demonstrates that all plaintiffs were competent employees. Employee evaluations were always above average for all three plaintiffs. Additionally, letters of commendation appear in several instances in their personnel files. Plaintiffs' attendance records all appear to be in order, and with one minor exception there are no negative reports on any of the plaintiffs. Further, each appears to have sufficient education to enable them to perform the duties of their respective positions, and perhaps more importantly, each has been employed in the Circuit Clerk's Office for a good number of years. Finally, each plaintiff has received a substantial number of promotions during his or her tenure with the Clerk's Office. Accordingly, the Court concludes that defendants have failed to show that nonpolitical reasons motivated plaintiffs' dismissals or would have prompted their discharge in any event. That defendants' *1411 replacements are arguably better qualified does not make plaintiffs unqualified.

c) Appropriateness of Political Affiliation Requirement

The last element of the Branti analysis involves a determination of whether defendants have demonstrated that political affiliation is an appropriate requirement for the positions that plaintiffs formerly held.[5] As discussed above, the purpose of this exception to the Branti no-discharge rule is to strike the proper balance between the competing concerns of employees' First Amendment rights and government efficiency in implementing the policy goals of new administrations. See Elrod, 427 U.S. at 367-68, 96 S.Ct. at 2686-87. Above all, it remains strikingly clear that it is defendants' burden to come forward with evidence demonstrating that political affiliation is an appropriate requirement for plaintiffs' positions. Branti, 445 U.S. at 518, 100 S.Ct. at 1294; Elrod, 427 U.S. at 368, 96 S.Ct. at 2687; Ecker, 542 F.Supp. at 900.
Defendants expended considerable effort at trial in an attempt to show that all three plaintiffs were "policymakers" or occupied "confidential" positions. This evidence was adduced mainly in the form of memoranda written by plaintiffs and the testimony of co-workers that plaintiffs were close to Joseph Roddy, wielded a lot of influence, or attended all staff meetings. With respect to plaintiffs McElroy and Barnes, the import of this evidence is barely significant in light of the Branti court's alteration of the Elrod policymaking-confidential analysis. Defendants' evidence indicates only that plaintiffs McElroy and Barnes were supervisors and/or upper level managers within the Circuit Clerk's office. As the Supreme Court noted in Branti, even conceded policymakers may occupy positions for which political affiliation is not an appropriate requirement. 445 U.S. at 518, 100 S.Ct. at 1294.[6]
As Branti makes abundantly clear, the question is whether political affiliation is an appropriate requirement for the positions held or formerly held by plaintiffs. The Missouri Supreme Court has promulgated rules and regulations for the administration of the state court system. Administrative Rule 7 (Joint Exhibit 1) sets out a staffing policy along with job descriptions.
With respect to plaintiffs McElroy and Barnes, the Court finds that political affiliation is not an appropriate requirement for their positions. Plaintiff McElroy was a Unit Manager II in the Operations Department of the Clerk's Office. While the Rule 7 job description for this position indicates that the occupant has some discretion, it is clear that a Unit Manager is nothing more than a high level manager/supervisor. The job duties are narrowly defined. Further, Rule 7 states clearly that a Unit Manager II operates under the supervision of the Circuit Clerk.
Plaintiff Barnes was a Unit Manager I at the time of her discharge. According to Rule 7 her job duties were similar to those of plaintiff McElroy. The only real difference is that a Unit Manager II normally "exercise[s] ... greater discretion and [manages] larger and more complex organizational structures...." Joint Exhibit 1 at *1412 V-19. As mentioned above, both Barnes and McElroy could be considered high level managers and supervisors with responsibility over a large number of people. Both could be considered to be vested with a slight degree of discretion in managing their respective departments. Both, however, were for the most part constrained to follow the extensive guidelines in Rule 7 and both were under the supervision and direction of the Circuit Clerk.
In light of this evidence, the Court cannot say that political affiliation is an appropriate requirement for the positions of Unit Manager I or II. Certainly it is not listed in Rule 7 as a qualification for those positions. In the Court's view, the only appropriate requirements for those positions are those that deal with ensuring sound management and supervisory skills on the parts of those who hold the positions. The reason why Elrod created the policymaking exception, later modified by Branti, is to ensure the efficient working of government. The Supreme Court recognized that new administrations need to have loyal people in some positions so that the new administration may carry out the policies for which the electorate voted. Elrod, 427 U.S. at 367, 96 S.Ct. at 2686. The emphasis in Elrod was on ensuring that the rule formulated in that case did not result in insulating from discharge those employees who were in positions to thwart the policies of the new administration. Id. The Court is convinced that neither McElroy nor Barnes occupied positions such that would enable them to undercut the policies of the Bosley administration.[7]
The Court's conclusions are different, however, with respect to plaintiff Thomas. Testimony at trial indicated that as Administrative Assistant I, Thomas had no narrowly defined job duties, see Elrod, 427 U.S. at 368, 96 S.Ct. at 2687, and was a trusted confidant of the former Circuit Clerk. Mr. Thomas testified that as Administrative Assistant I he spent all his working time in the Clerk's office. Further, the Rule 7 description of the position of Administrative Assistant I indicates that the occupant is to "[relieve] the circuit clerk ... of administrative detail." Joint Exhibit 1 at V-12. He or she is responsible for various administrative tasks, and must exercise "initiative and independent judgment ... within a broad framework of existing policies." Id. Further, the description indicates that an Administrative Assistant I plays a key role in recommending and implementing policy. For these reasons, the Court finds that political affiliation is an appropriate requirement for the position of Administrative Assistant I. The Court believes that a person who disagrees with the beliefs and policies of an incoming Circuit Clerk and who occupies the position of Administrative Assistant I could indeed hamper the implementation of the policies the new Clerk was elected to carry out.
One factual circumstance, however, prevents this matter from being an ordinary Branti-type case with respect to plaintiff Thomas. After Circuit Clerk Bosley's election, but before he took office, plaintiff Thomas was transferred to the position of Court Clerk III, a predominantly ministerial position. This transfer was effective December 17, 1982, approximately two weeks before Mr. Bosley was to take office. The transfer took place at no reduction in plaintiff Thomas's salary and was done admittedly *1413 to "protect" Thomas's job. Obviously, Mr. Roddy and plaintiff Thomas were aware of the Supreme Court's Branti and Elrod decisions. When Thomas was transferred to Court Clerk III, the occupant of that position, Ralph Layton, a Bosley supporter, was made Mr. Roddy's Administrative Assistant I. The novel issue here is whether the Court should consider plaintiff Thomas's old position as Administrative Assistant I or his new position as Court Clerk III in determining whether political affiliation is an appropriate requirement for the position he held.
The Court believes that Thomas's lateral transfer to Court Clerk III should be disregarded for purposes of the analysis here. The timing of the transfer, the fact that no pay cut was involved, and Ralph Layton's status as a Bosley supporter buttress the inference that the transfer was accomplished to circumvent the Branti exception to the no discharge rule. The Court notes that Thomas was transferred to a nonvacant protected position which resulted in Layton's transfer to a nonprotected position. This attempted subterfuge cannot be abided, however, because the potential exists for persons in protected positions to be transferred to vulnerable nonprotected positions at the risk of losing their jobs. Certainly, this was not an intended result of Branti and Elrod. The Court notes that the situation might well be different in cases in which the nonprotected employee is transferred to a vacant protected position. In such a situation no innocent employee would suffer the risk of losing his or her job as a result of the transfer, and the employee transferred to the protected job would not be in a position to thwart the policies of the new administration.
In summary, the Court finds that all plaintiffs were discharged solely for political reasons and that none would have been discharged for other, legitimate causes. Further, plaintiffs McElroy and Barnes occupied positions for which the requirement of political affiliation was not appropriate, while plaintiff Thomas occupied a position for which political affiliation was an appropriate requirement.

d) Relief

Plaintiffs Barnes and McElroy are entitled to certain relief on their First Amendment claim against both defendants in their official capacities. There was sufficient evidence to indicate that both defendant Carter and defendant Bosley were involved in the decision to terminate plaintiffs.
Certainly, plaintiffs McElroy and Barnes are entitled to declaratory and injunctive relief inasmuch as the Court has found that defendants violated their First Amendment rights. Additionally, plaintiffs request reinstatement with full backpay and benefits including the restoration of service time, health and pension benefits. This is the relief that would best make plaintiffs whole and compensate them for the injury caused by defendants' First Amendment violation and is also within the Court's authority to award. Kingsville Independent School Dist. v. Cooper, 611 F.2d 1109, 1114 (5th Cir.1980). As a prevailing party, both McElroy and Barnes are entitled to attorneys' fees under 42 U.S.C. § 1988. The Court will order plaintiffs to submit their affidavits for attorneys' fees within seven days of the date of this Memorandum. Plaintiffs should include an hourly rate and a detailed index of attorney time spent on the First Amendment portion of their cases.
As to plaintiffs claims for compensatory and punitive damages for alleged emotional distress, the Court finds that plaintiffs' claims were not sufficiently proven. Plaintiffs testified that they were embarrassed and humiliated because of their discharges, but this is clearly an insufficient basis for claims of emotional distress caused by constitutional violations. Nekolny v. Painter, 653 F.2d 1164, 1172 (7th Cir.1982).

II. Due Process

Although it was not a major portion of their case, plaintiffs attempted to prove that defendants' actions deprived them of a *1414 property right in continued employment without due process of law.
Under the established Due Process analysis one must consult state law to determine the existence and dimensions of alleged property interests. Roth v. Board of Regents, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Plaintiffs must prove that they have some legitimate expectation of continued employment and that they are more than employees at will. Bishop v. Wood, 426 U.S. 341, 345-46, 96 S.Ct. 2074, 2077-78, 48 L.Ed.2d 684 (1976).
Plaintiffs candidly admit that they have no binding agreement with the State of Missouri that would give them a reasonable expectation of continued employment. Additionally, no statutory source of such an expectation has been demonstrated to the Court. Plaintiffs' sole source of their alleged property interest seems to be Administrative Rule 7.01A which defines "permanent employees" as those with no set expiration term for their appointments. Under Rule 7, an employee who successfully completes a probationary period becomes a permanent employee.
The Court believes plaintiffs had no legitimate expectation of continued employment. No contract or statute would provide this, and Rule 7 merely makes the appointments of Circuit Clerk employees open-ended. If anything, Rule 7 would indicate that employees have no fixed tenure in their positions. Missouri law is clear that in the absence of a contract for a definite term of employment or a statutory source creating such a term, an employee serves at the will of his employer. See Amaan v. City of Eureka, 615 S.W.2d 414, 415 (Mo. 1981) (en banc). Plaintiffs have failed to show they were deprived of a property right by defendants, and accordingly, the Court will enter judgment for defendants on plaintiffs' Due Process claims.

III. §§ 1985 and 1986

Although pleaded in their complaint, plaintiffs presented very little evidence on their §§ 1985 and 1986 claims. At any rate, plaintiffs have failed to prove that they were the victims of racial or class based discrimination, one of the elements of an action under § 1985(3). Griffin v. Breckenridge, 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971). Because a § 1986 claim depends on the existence of a valid § 1985 claim, Williams v. St. Joseph Hospital, 629 F.2d 448 (7th Cir.1980), plaintiffs' § 1986 is meritless as well. Accordingly, the Court will enter judgment in favor of defendants on plaintiffs' §§ 1985 and 1986 claims.
NOTES
[1] Plaintiffs are proceeding on their constitutional claims under 42 U.S.C. § 1983. There is no question that defendants' actions were taken under color of state law and thus § 1983 is an appropriate avenue by which plaintiffs may proceed in this action.
[2] "Established" is perhaps too strong a characterization of the Branti and Elrod opinions. Several decisions that protected the constitutional rights of public employees predate Branti and Elrod. See, e.g., Cafeteria Workers v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961) and Weiman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952).
[3] Some courts have questioned whether Branti and Elrod pose a requirement that politics be the sole motivating factor behind a decision to discharge a public employee. Although both cases contain such language, they were dealing with District Court findings of fact to that effect. Both the Fifth and Seventh Circuits have adopted the less stringent standard of Mt. Healthy City Bd. of Educ. v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). See Nekolny v. Painter, 653 F.2d 1164, 1167-68 (7th Cir.1981); Tanner v. McCall, 625 F.2d 1183, 1193-95 (5th Cir.1980), cert. denied, 451 U.S. 907, 101 S.Ct. 1975, 68 L.Ed.2d 295 (1981). Under the Mt. Healthy standard, plaintiff need only prove that constitutionally protected activity (i.e., political affiliation) was a motivating factor in plaintiff's discharge. Because of the Court's view of the facts of the matter sub judice, however, it need not address which standard should be applied here.
[4] Defendants' contention that this is not a case covered by the doctrine of Branti and Elrod because Roddy and Bosley were both Democrats is specious. Ecker v. Cohalan, 542 F.Supp. 896 (E.D.N.Y.1982) does not turn on this issue. Nor would it make sense to risk the emasculation of constitutional protections in geographic areas in which the only real contests occur at the primary level. The Court takes judicial notice of the fact that currently the Democratic Party is firmly in control of political offices within the City of St. Louis. Fed.R.Evid. 201.
[5] Defendants' attempts to demonstrate that no one ever requested plaintiffs or others to alter their political allegiance is unavailing. Branti makes it quite clear that plaintiffs need not prove actual or overt coercion on the part of defendants. 445 U.S. at 516-17, 100 S.Ct. at 1293-94.
[6] Indeed, some of the evidence introduced by defendants on the issue of whether plaintiffs are excepted from the Elrod-Branti protections was in the form of memoranda written by plaintiffs McElroy and Barnes concerning mailing procedures, the wearing of blue jeans by office employees, and the ordering of office supplies. Even assuming arguendo that this evidence indicates that plaintiffs are "policymakers," it does not support the proposition that political affiliation is an appropriate requirement for the positions occupied by plaintiffs McElroy and Barnes. Much like the Court's example of the football coach in Branti, no one can seriously claim that a Bosley Democrat could better regulate the wearing of blue jeans than a Roddy Democrat. 445 U.S. at 518, 100 S.Ct. at 1294.
[7] Defendants argue that plaintiffs McElroy and Barnes had sensitive, highly policymaking duties, notwithstanding the apparent limits of their job duties, due to their relationship with Joseph Roddy. This does not alter the Court's decision because Circuit Clerk Bosley can simply choose not to bestow such additional duties on McElroy or Barnes.

Nor is it a sound argument in defendants' favor that plaintiffs were hired as patronage employees and thus should have expected to be discharged with the election of a new Circuit Clerk. The Supreme Court has rejected such "waiver" arguments in both Branti, 445 U.S. at 512 n. 6, 100 S.Ct. at 1291 n. 6, and Elrod, 427 U.S. at 359-60 n. 13, 96 S.Ct. at 2682-83 n. 13. Although the result here may seem incongruous or harsh inasmuch as employees hired under the former freewheeling patronage system are protected from dismissal, see Ecker, 542 F.Supp. at 903, the fact that First Amendment violations were suffered lightly in the past does not lessen the need for enforcement of the Amendment today.