626 F.2d 875

**COMMITTEE TO PROTECT the FIRST AMENDMENT RIGHTS OF EMPLOYEES OF the DEPARTMENT OF AGRICULTURE, Appellant,**

v.

**Bob BERGLAND, Individually and as Secretary of Agriculture, Appellees.**

No. 78–2030.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 15, 1979.

Decided Dec. 27, 1979.

Certiorari Denied June 16, 1980. See 100 S.Ct. 3012.

Carl L. Shipley, Washington, D. C., for appellant.

John H. E. Bayly, Jr., Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert,[*] U. S. Atty., John A. Terry, Peter E. George and David H. Shapiro, Asst. U. S. Attys., Washington, D. C., were on brief, for appellees.

[*] United States Attorney at the time the brief was filed.

[**] This opinion was written by Circuit Judge Leventhal and concurrences were received from the other Judges prior to his death.

1. 5 C.F.R. §§ 213.3101, 213.3113(d)(3) and (e)(4) (1978).

2. 5 C.F.R. § 6.2 (1978).

Walter H. Fleischer and Alfred F. Belcuore, Washington, D. C., were on the brief for amicus curiae urging reversal.

Before LEVENTHAL,[**] ROBB and WALD, Circuit Judges.

Opinion for the Court filed by Circuit Judge LEVENTHAL.[**]

LEVENTHAL, Circuit Judge:

This appeal presents a claim that the Secretary of Agriculture had denied employment on the basis of political beliefs and associations. The Committee to Protect the First Amendment Rights of Employees of the Department of Agriculture (Committee) brought the action for declaratory and injunctive relief, claiming that its members had been denied employment on that basis in violation of their constitutional rights. The district court granted the Secretary's motion for summary judgment, and we affirm.

## I. BACKGROUND

The Committee is an *ad hoc* organization composed of former employees of the Department of Agriculture who occupied positions in the field service as either State Directors of the Farmers Home Administration (FmHA) or State Executive Directors of the Agricultural Stabilization and Conservation Service (ASCS). The United States Civil Service Commission (Commission) has excepted both positions from the competitive civil service, classifying them Schedule A.[1] The Commission's general regulations concerning Schedule A (and Schedules B and C) positions are in the margin.[2] The Schedule A jobs are defined

§ 6.2 *Schedules of excepted positions.*
The Commission shall list positions that it excepts from the competitive service in Schedules A, B, and C, which schedules shall constitute parts of this rule, as follows:
*Schedule A.* Positions other than those of a confidential or policy-determining character for which it is not practicable to examine shall be listed in Schedule A.

as "positions other than those of a confidential or policy determining character for which it is not practicable to examine . . . ."[3]

On April 22 and April 25, 1977, the newly appointed Secretary of Agriculture discharged a total of nine FmHA State Directors and seventeen ASCS State Executive Directors. The Committee brought this lawsuit in district court, and sought injunctive relief, claiming the Secretary was "dismissing and threatening to dismiss [its] members from their positions . . . for partisan political reasons and threatening to and has appointed political supporters of the Carter administration to the positions now occupied by [those] members in consideration of their political support."[4]

> Schedule B. Positions other than those of a confidential or policy-determining character for which it is not practicable to hold a competitive examination shall be listed in Schedule B. Appointments to these positions shall be subject to such non-competitive examination as may be prescribed by the Commission.
> Schedule C. Positions of a confidential or policy-determining character shall be listed in Schedule C.

3. 5 C.F.R. § 6.2 (1978); 5 C.F.R. § 213.3101 (1978). The same definition appears in the Commission's regulations regarding such posts in the Department of Agriculture. 5 C.F.R. § 213.3101 (1978).

4. Complaint, Paragraph 6.

5. *Committee for Protection of First Amendment Rights of Department of Agriculture Employees v. Bergland*, 434 F.Supp. 314 (D.D.C. 1977).

6. The Chairman's letter read:
   Dear Mr. Secretary:
   This refers to your request for Civil Service Commission approval to convert from Schedule A to Schedule C 50 State Executive Director positions in the Agricultural Stabilization and Conservation Service.
   The Commission cannot conclude at this time that these positions meet the Schedule C criteria for exception as policy-determining or confidential. We are therefore unable to approve your request.
   Exhibit "E" of Memorandum of Points and Authorities supplementing appellant's brief.
   Secretary's Bergland's request was in a letter to the Commission dated March 1, 1977. Appendix to appellant's brief at 10–11.

The district court denied a temporary restraining order and consolidated the hearings on plaintiff's motion for preliminary injunction and defendants' motion to dismiss the complaint. On June 3, 1977, the district court dismissed the complaint.[5]

Subsequently, two letters were sent from the Chairman of the Commission to the Secretary. On August 5, 1977, the Commission declined the Secretary's request to reclassify State Executive Directors of ASCS from Schedule A to Schedule C.[6] It stated: "The Commission cannot conclude at this time that [State Executive Directors of ASCS] meet the Schedule C criteria for exception as policy-determining or confidential." In the second letter, dated March 29, 1978, the Secretary refined his position.[7]

7. Secretary's letter to Chairman Campbell read:
   Dear Scotty:
   The top State positions in both the Farmers Home Administration (FmHA) and the Agricultural Stabilization and Conservation Service (ASCS) of this Department are filled through Excepted Appointment Authorities. This has been the case since the 1950's when the positions were converted to Schedule A. We are both aware of significant difficulties which this situation has caused with every change of Administration since that time. We have recently reviewed this situation and I have decided that the existing Schedule A authorities are inappropriate for these key field positions.
   There are significant differences between the two Agencies. In the case of ASCS, the State Executive Directors must by the nature of their positions be deeply involved in supporting and defending the farm policies and programs of the Administration. These policies and programs are politically controversial. I firmly believe that these positions should be placed in Schedule C.
   The FmHA State Directors are, by contrast, responsible for managing a business type operation. Their loan programs do not generate the same degree of political controversy. In my opinion, existing examining capabilities can properly provide for competitive career appointments to these positions. I believe that FmHA State Directors should be in the career service.
   I wanted you to know my intentions on this serious matter in advance of any formal presentation by this Department.
   In the very near future, we will be forwarding our formal requests and justifications on this matter.

He repeated his view that difficulties had arisen in consequence of the action taken in the 1950's, which converted to Schedule A the positions of state directors of ASCS and FmHA. He reiterated his opinion that State Directors of ASCS should be converted from Schedule A to Schedule C. He indicated a distinction as to FmHA State Directors which he believed "should be in the career service." [8] This court remanded the case to the district court for consideration of the March 29, 1978 letter and any related evidence.[9]

Upon remand, the district court reopened the record to consider the letter of August 5, 1977 as well as that of March 29, 1978. Both parties filed motions for summary judgment. By Memorandum Opinion and Order dated August 10, 1978, the district court, finding that the "letter and additional evidence [did] not affect [its] previous determination," granted summary judgment [10] to the Secretary. Plaintiff's appeal followed.

## II. ANALYSIS

In *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1975), the Supreme Court declared unconstitutional the dismissal of nonpolicymaking government employees because of their partisan political affiliation or nonaffiliation. Justice Brennan, writing for the plurality, relied upon *Keyishian v. Board of Regents*, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967) and *Perry v. Sinderman*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), to advance the proposition that government cannot condition the retention of government positions on demands which would be unconstitutional if made directly. 427 U.S. at 358–60, 96 S.Ct. 2673. The opinion responds to the needs of a new administration to insure that its policies will not be undercut by obstructionist tactics, but it does so by "limiting patronage dismissals to policymaking positions." 427 U.S. at 367, 96 S.Ct. at 2687. Justices Stewart and Blackmun completed the majority, confining themselves to concurring in the result on the ground that a "nonpolicymaking, nonconfidential government employee can [not] be discharged or threatened with discharge from a job that he is satisfactorily performing upon the sole ground of his political beliefs." 427 U.S. at 374–75, 96 S.Ct. at 2690 (Stewart, J. concurring). In applying the *Elrod* standard, therefore, we must look to (1) the nature of the position involved and (2) the ground for dismissal.

### A. The Nature of the Positions Involved

The Committee contends that the two posts held by its members are not policymaking positions. The district court disagreed. While it is true that "[n]o clear line can be drawn between policymaking and nonpolicymaking positions," 427 U.S. at 367, 96 S.Ct. at 2687, the Supreme Court has proffered some general principles that guide our consideration:

While nonpolicymaking individuals usually have limited responsibility, that is not to say that one with a number of responsibilities is necessarily in a policymaking position. The nature of the responsibilities is critical. Employee supervisors, for example, may have many responsibil-

Exhibit "F" of Memorandum of Points and Authorities supplementing appellant's brief.

8. At oral argument, counsel for the government represented that the Secretary had repudiated his earlier position that FmHA State Directors belonged in the classified civil service. The *amicus curiae* makes reference to the fact that the Secretary had "retreated" from the earlier position, and cites a Declaration of Bob Bergland dated July 24, 1978 to the effect that "the appropriate classification to permit needed flexibility in appointment authority for [the position of FmHA] is Schedule C." Brief for Amicus Curiae Mahlon M. Delong at 14.

9. *Committee to Protect the First Amendment Rights of Employees of the Department of Agriculture v. Bergland*, 188 U.S.App.D.C. 199, 578 F.2d 441 (D.C.Cir.1978).

10. *Committee for the Protection of First Amendment Rights of Department of Agriculture Employees v. Bob Bergland* (Civil Action No. 77-0481, August 11, 1978), reproduced as Exhibit "C" of Memorandum or Points and Authorities Supplementing Appellant's Brief.

ities, but those responsibilities may have only limited and well-defined objectives. An employee with responsibilities that are not well defined or are of broad scope more likely functions in a policymaking position. In determining whether an employee occupies a policymaking position, consideration should also be given to whether the employee acts as an adviser or formulates plans for the implementation of broad goals.

*Id.* at 367–68, 96 S.Ct. at 2687.

In determining whether the pertinent positions are policymaking, the district court considered the published job descriptions.[11] The ASCS State Executive Director, grade GS–15, is described as:

[F]ully responsible for planning, organizing, and directing the program and management operations of ASCS activities throughout the State. Within broad policy, makes decisions and commitments on all phases of administration of the assigned programs, and actively participates . . . in State ASCS program and policy formulation. Recommends changes and revisions in State and National policies.

The FmHA State Director, grade GS–15:

[F]ormulates and implements the total FHA program within the State jurisdictional area, exercising executive leadership in developing and implementing operating principles and practices desirable or necessary to promote and achieve the purposes and objectives of the overall FHA program or specialized phases thereof. Gives emphasis to development of annual goals and long-range plans of operation.

There is no contention that these job descriptions are a spurious facade.

In his inquiry, the district judge also considered testimony from two government witnesses and three of the terminated employees that the directors "exercise considerable control over the implementation of the administration's agricultural program policies at the state and local level, and, thereby, insure either the success or failure of the programs." [12]

This evidence fully justified the district court in concluding that the positions in question were policymaking ones. That conclusion is reinforced by the likelihood that persons administering huge Federal government programs for an entire state will have a high policy component to their activities, both because such large scale exercise of power usually implicates substantive internal policy, and because such positions are a natural source for influential recommendations of changes in policy. Each state director supervises a staff of nearly 100 statewide and acts as "the administration's pipeline and advocate at the state and the local level." [13]

■ Appellant argued its case, both in the district court and before us, on the theory that the courts are controlled by the Commission's determination, in classifying the posts, that they were nonpolicymaking. We reject that view. Obviously, a Commission determination would not be conclusive against an individual who claimed that the agency had been overly restrictive in defining his constitutional rights. The content and scope of constitutional rights—their minima and maxima—are the special province of the courts.[14]

---

11. Order of June 3, 1977, *supra* note 5. Findings of Fact 1–4, 434 F.Supp. 314 at 316–17; Conclusion of Law 9, *id.* at 319.

   It is possible that in a particular case an employee might believe that the job description was overblown, and that it is a facade hiding what is actually performance of a ministerial function. But that would not necessarily end the matter, because the cabinet officer might wish to change the method of operation so as to assure a stronger policy component in order to achieve the objectives of his administration. We need not, and do not, reach that point,

however, because in this case appellant has not presented the matter to us on the basis that it has penetrated a facade.

12. Finding of Fact 5, 434 F.Supp. 314, 317.

13. *Id.*

14. Appellant argues that a reviewing court must give deference to an agency's interpretation of its governing statute and regulations, and that, therefore, the Civil Service Commission's classification of ASCS and FmHA posi-

In approaching the constitutional inquiry we of course take into consideration the determination of the Civil Service Commission. In this litigation, however, we are confronted by the difficulty that the Commission has evolved a specialized terminology and set of classifications. The positions in Schedules A and C are both "excepted" from the competitive civil service, but the relationship between these schedules is not easy to ascertain—as is evident from a reference to the Commission's reports.[15] What is certainly plain is that the basis of the Commission's distinctions is different from the basis underlying the *Elrod* categories.[16]

The point is dramatized by the fact, brought out at oral argument, that at least some attorneys on the White House staff are classified Schedule A—that is, classified by the Commission as occupying positions not of a policymaking or confidential character. In fact, there are substantial numbers of attorneys in government service classified as Schedule A.[17] So also are law clerks, chaplains, and some officials appointed by the President without confirmation by the Senate, among others.[18] By contrast at least some stenographic secretaries, a category of secretaries distinct from private secretaries, are classified as policymaking or confidential.[19]

A court ruling that a position has a policymaking character which makes *Elrod* in-

applicable is not to be taken as condemning any action of the Commission in classifying the position as Schedule A. The Civil Service Commission may classify positions as Schedule A rather than Schedule C in order to nudge forward toward the goal of enhancing a "career" civil service. Both Schedule A and Schedule C positions are excluded from the competitive civil service. The distinction has legal—not constitutional—significance in that veterans holding Schedule A positions acquire procedural rights under current laws and regulations.[20] And in common understanding, Schedule A positions are considered less "political" than those in Schedule C, so that in practice holders of Schedule A positions are less likely to seek or accept political assignments on their own time, and are more likely to have *de facto* tenure even with political changes. However, if a position does have significant policymaking components, it cannot be given *Elrod*-constitutional status merely on the basis of hopeful expectations. And appellant did not challenge the analysis of the district court, but relied solely on the Commission's classification.

In the initial proceeding on these positions, the district court did not ignore the CSC designation of them, but explicitly weighed that as a factor in its consideration of the nature of the two positions in-

---

tions should control our consideration of the matter. Appellant's brief at 10–11. This argument misses the point. We are not interpreting the CSC regulations, rather we are defining the constitutional status of the positions held by appellant's members. The question in this case is not what the CSC regulations mean, but whether they are conclusive on the constitutional issue.

15. The two broad categories of federal employment are the competitive service and the excepted service, with the "career service" being generally a subset of the former. The competitive service includes any position for which an "exam" is given, which "exam" can be either a written test or a more general "review" of the candidate's education and experience. *See generally* United States Civil Service Commission Fiscal 1977 Annual Report (1978); *see also* Federal Personnel Manual at 212–3 to 212–5 (July 31, 1978). Schedule A and Schedule C positions are generally in the excepted service, but some of them are held by employees with

competitive status under conditions that make the positions competitive while those employees remain in them. Federal Personnel Manual at 212–4 (July 31, 1978).

16. The Civil Service regulations involved here were promulgated in 1963, more than a decade before *Elrod*. Consequently, it cannot be argued that they were designed to implement the standards articulated in that case.

17. § 213.3101 Federal Personnel Manual (July 31, 1978).

18. *Id.*

19. *See, e. g.*, United States Civil Service Commission Fiscal 1977 Annual Report at 78 (1978).

20. None of the terminations challenged by the appellant related to veterans.

volved.[21] On remand, the court expressly considered whether either of the two letters effected its "previous determination that the ASCS and FmHA directorships are 'policymaking' positions within the scope of the exception in *Elrod*."[22] It concluded that the "letters effect no change in the duties of [the] positions . . . instead, they bear on the classification of the positions,"[23] and that its earlier determination was correct. We agree.

## B. *Ground for Dismissal*

*Elrod* holds that it is impermissible for a government agency to dismiss a nonpolicymaking employee solely for political reasons. It does not bar every termination of a nonpolicymaking official. In invoking *Elrod*, appellant relies on a statement of the district judge during the course of the proceeding that "these were patronage dismissals, pure and simple."[24] But the district court decision notes uncontroverted testimony that the administration did not know to which political party the incumbents belonged and that the Secretary never attempted to coerce the members of Appellant's group to change their party in order to retain their jobs.[25] There is evidence in the record that the purpose of the Secretary's personnel review was to spotlight incumbents "of such outstanding qualities that they [should] be retained" when most incumbents were being replaced "by individuals who supported the policies and programs of the new administration."[26]

This case differs in some significant respects from *Elrod* as to the reasons for the terminations. The district court did not find that the employees were dismissed solely for political reasons, and indeed cited parts of the record that point to a motivation of the Secretary to enhance policy formulation and execution. However, since we hold that the positions involved are policymaking, we need not and do not consider whether appellant's showing would suffice to establish a constitutional infringement if the positions were nonpolicy in character.

## III. CONCLUSION

■ It is for the court, not the Civil Service Commission, to decide whether a position is policymaking for constitutional purposes within the meaning of *Elrod v. Burns*. The district court gave due consideration to the Commission's classification, and to the correspondence between the Commission and the Secretary of Agriculture. It emphasized the evidence introduced on the nature of the positions. We affirm the conclusion that the positions occupied by the members of appellant's group were policymaking and therefore the discharge of the incumbents did not infringe upon their constitutional rights.[27]

*Affirmed.*

---

21. 434 F.Supp. 314 at 320.

22. Memorandum of August 11, 1978, *supra* note 4, at p. 3.

23. *Id.* at p. 4.

24. Transcript of May 13, 1977 at 100.

25. Order of June 3, 1977, *supra* note 5, 434 F.Supp. at 318.

26. *Id.* at 317–18.

27. As already noted, *supra* page 7, Justice Brennan's opinion *Elrod* stated that the need to implant the policy of a new administration is secured by permitting "patronage dismissals" for policymaking positions. There is no indication that the dismissal must be further justified by a determination that the incumbent would fall short in discharge of new policy directives.