Luis O. JUARBE–ANGUEIRA,
Plaintiff, Appellee,

v.

Luis Rafael ARIAS, Director of the
Public Building Authority,
Defendant, Appellant.

No. 86–2012.

United States Court of Appeals,
First Circuit.

Argued May 5, 1987.

Decided Sept. 29, 1987.

---

Marcos A. Ramirez-Lavandero with whom Hector Rivera Cruz, Secretary of Justice, Marcos A. Ramirez Irrizarry and Ramirez & Ramirez, Hato Rey, P.R., were on brief, for defendant, appellant.

Israel Roldan Gonzalez, Aguadilla, P.R., for plaintiff, appellee.

Before BOWNES, BREYER and TORRUELLA, Circuit Judges.

BREYER, Circuit Judge.

In March 1985, the Director of the Public Building Authority of the Commonwealth of Puerto Rico (the "PBA Director") dismissed Luis Juarbe Angueira from his job as the PBA's Regional Director for the Aguadilla Region. Juarbe Angueira subsequently brought suit, claiming that his dismissal violated the United States Constitution. He said that the PBA Director dismissed him because he was a member of the New Progressive Party (the "NPP") and that the First Amendment protected him from such a "politically based" discharge. *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). He asked the court both to order his reinstatement and to require the PBA Director to pay him damages.

The PBA director moved to dismiss the damage claim. He said that the dismissal either was legal or its illegality in early 1985 was, at the least, unclear and that he therefore possessed a "qualified immunity" protecting him from having to pay damages. *Harlow v. Fitzgerald,* 457 U.S. 800, 815–19, 102 S.Ct. 2727, 2736–39, 73 L.Ed.2d 396 (1982); *Anderson v. Creighton,* —— U.S. ——, —— – ——, 107 S.Ct. 3034, 3037–40, 97 L.Ed.2d 523 (1987). The district court denied the PBA Director's motion to dismiss. The Director now appeals that interlocutory decision. *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (denial of summary judgment on claim of qualified immunity appealable as a "final decision"); *De Abadia v. Izquierdo Mora,* 792 F.2d 1187, 1190 (1st Cir.1986) (same even though damage claim is joined with claim for injunctive relief).

After examining the record in this case, we have concluded that the defendant is correct; he is entitled to "qualified immunity" in respect to the damage claim. We rest our holding, however, on a narrow legal ground. If we assume purely for the sake of argument that Juarbe Angueira's dismissal was unlawful, even so, the law in respect to the dismissal, viewed as of March 1985, was unclear. That is, as of that time one could not say that the dismissal was *clearly* unlawful. And, only where the action in question is *clearly* unlawful does a defendant lose his qualified immunity. *See Harlow v. Fitzgerald,* 457 U.S. at 818, 102 S.Ct. at 2738. In deciding this appeal on this narrow ground, we express no view about whether the plaintiff is ultimately entitled to reinstatement.

I

This case raises no new, generally significant legal issues. We have previously considered the question of "qualified immunity" from damage liability in the context of a claim of "politically motivated discharge". *See Roman Melendez v. Inclan,* 826 F.2d 130 (1st Cir.1987); *Roure v. Hernandez Colon,* 824 F.2d 139 (1st Cir.1987); *Quintana v. Anselmi,* 817 F.2d 891 (1st Cir.1987); *Raffucci Alvarado v. Sonia Zayas,* 816 F.2d 818 (1st Cir.1987); *Vazquez Rios v. Hernandez Colon,* 819 F.2d 319 (1st Cir.1987); *Rosado v. Zayas,* 813 F.2d 1263 (1st Cir.1987); *Mendez-Palou v. Rohe-*

*na-Betancourt,* 813 F.2d 1255 (1st Cir. 1987); *Monge-Vazquez v. Rohena-Betancourt,* 813 F.2d 22 (1st Cir.1987); *Cheveras Pacheco v. Rivera Gonzalez,* 809 F.2d 125 (1st Cir.1987); *Rodriguez Rodriguez v. Munoz Munoz,* 808 F.2d 138 (1st Cir.1986); *De Abadia v. Izquierdo Mora,* 792 F.2d 1187 (1st Cir.1986). *See also Jimenez Fuentes v. Torres Gaztambide,* 807 F.2d 236 (1st Cir.1986) (preliminary injunction claim), *cert. denied,* —— U.S. ——, 107 S.Ct. 1888, 95 L.Ed.2d 496 (1987); and *De Choudens v. Government Development Bank,* 801 F.2d 5 (1st Cir.1986) (same), *cert. denied,* —— U.S. ——, 107 S.Ct. 1886, 95 L.Ed.2d 494 (1987). We have explained that public officials generally are entitled to "qualified immunity" from personal liability for those acts, taken in the course of their duties, that may have violated a party's constitutional rights *unless* the law defining those rights was *"clearly established* in plaintiff's favor." *De Abadia,* 792 F.2d at 1193 (emphasis added); *see also Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986) (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law"); *Harlow v. Fitzgerald,* 457 U.S. at 818, 102 S.Ct. at 2738 (officials are immune "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known"; the reasonableness "measured by reference to clearly established law ... at the time an action occurred") (footnote omitted). And, we have said more specifically that a defendant faced with a political discharge claim enjoys qualified immunity unless, at the time of dismissal, "it was clearly established that employees in the *particular positions* at issue, in light of the responsibilities inherent in those positions, were [constitutionally] protected from patronage dismissal." *Mendez-Palou,* 813 F.2d at 1259 (emphasis in original). *See Anderson v. Creighton,* —— U.S. at ——, 107 S.Ct. at 3039 ("in the light of preexisting law the unlawfulness [of the particular act] must be apparent").

We have also pointed out that, for the most part, in early 1985, the law did not clearly forbid dismissals of those in "upper-level" managerial-type government positions. Rather, the Supreme Court had then set forth the law in highly general terms. It said that the Constitution provided protection from politically-based discharge to public employees *other than* those in jobs where "party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti,* 445 U.S. at 518, 100 S.Ct. at 1295. But, the Court did not specify just where "party affiliation" was, or was not, "appropriate." It was difficult to conclude with any certainty that "party affiliation" was *not* "an appropriate requirement for the effective performance" of most upper-level government jobs. It was difficult to predict (in respect to these upper-level jobs) just how the courts, in particular instances, would draw the line that the Supreme Court described in *Branti*—a line that seeks to separate instances where (1) a newly elected political party can legitimately replace those who hold important offices in order to carry out its electoral mandate and to provide voters with the confidence it is doing so (i.e., where a 'new broom' ought to 'sweep clean'), from (2) pure political patronage (i.e., 'jobs for the boys').

In fact, courts have been reluctant to define *Branti*'s "political exception" too narrowly lest they prohibit newly elected officials from implementing new policies in areas that sound technical (antitrust, development banks, park services) but which, depending on time and circumstances, may become politically charged. *See Tomczak v. City of Chicago,* 765 F.2d 633, 641 (7th Cir.), *cert. denied,* 474 U.S. 946, 106 S.Ct. 313, 88 L.Ed.2d 289 (1985). Lower courts (through 1985) applied *Branti's* exception broadly, finding First Amendment protection against politically based dismissals only for highly technical or very low level jobs, such as a road grader, a city court bailiff, a bookkeeper, a deputy court clerk, a deputy sheriff, or a supervisor of a branch of an auditor's office. They explicitly denied protection to an assistant director of public information for a county, the first deputy commissioner of a depart-

ment of water, the superintendent of employment for a Chicago park district, an assistant district attorney, a fee agent, a city solicitor and assistant solicitor, the state director of the Farmers Home Administration, and a deputy parks commissioner. *See* Appendix. There is nothing in these decisions, for example, that would suggest *Elrod* or *Branti* radically changed existing federal practice, a practice that permits Presidents to replace at will United States Attorneys, regional heads of the General Services Administration, up to 10 percent of the top agency Senior Executive Services positions, and many other holders of significant offices. Senate Comm. on Govt. Affairs, 98th Cong., 2d Sess., *Policy and Supporting Positions* 122, 201, 255 (Comm. Print 1984); 5 U.S.C. § 3134(b) (1982).

Of course, as we have recognized, the Supreme Court of Puerto Rico held, in 1982, 1983 and 1984, that many upper level government jobs fall outside *Branti*'s "political exception." But, as we have also said, those cases based on Puerto Rican law and "go[ing] further than" most other court interpretations of *Elrod/Branti,* "are not conclusive as to the state of the law." *Rodriguez Rodriguez,* 808 F.2d at 142.

Indeed, Puerto Rico's officials might have found upper-level job protection from political discharge particularly difficult to predict in light of Puerto Rico's own civil service system which classifies upper-level jobs such as those in question here as "confidential" or "trust" positions, positions outside the career civil service. Commonwealth law permits the Central Office of Personnel Administration to exempt no more than 25 positions per agency from the career system, using as criteria whether the job involves "formulation of public policy," P.R.Laws Ann. tit. 3, §§ 1350, 1351(3) (1980 & Supp.1986), or "[d]irect services to the head or subhead of the agency which require a high degree of personal trust." P.R. Personnel Bylaws: Areas Essential to the Merit Principle, § 5.2 (1976). Appellants have told us that 3,729 employees out of 162,387 are in the "trust" or "confidence" service (of which the new Common-wealth government says it has dismissed or demoted approximately 600 persons, and, of these, 319 have brought suit). We have said that the "legislature's classification system" does not determine "the *Elrod/Branti* question," but we have also said "it is entitled to some deference." *Jimenez Fuentes,* 807 F.2d at 246.

The upshot is that defendants will normally enjoy qualified immunity from damage liability in upper-level, managerial-type job dismissal cases, cases where the jobs in question are not purely technical or scientific in nature. This court said in *Mendez-Palou* that a defendant enjoys "qualified immunity" as long as the job in question "*potentially* concerned matters of partisan political interest and involved at least a *modicum* of policymaking responsibility, access to confidential information, *or* official communication." *Mendez-Palou,* 813 F.2d at 1259 (emphasis added). This legal standard governs the case before us.

## II

As in *Jimenez Fuentes,* 807 F.2d at 243–46, and *Mendez-Palou,* 813 F.2d at 1260, we apply the legal standards to the facts of the particular case only insofar as they are not in dispute. We find here no significant dispute in respect to those characteristics of the position of Regional Director that are set forth in a Job Classification Questionnaire sent to the Puerto Rico Personnel Office (for purposes of deciding whether the position is a "trust" position); the "position of trust" classification that the PBA prepared in 1976 and filed with the Director of the Central Office for the Administration of Personnel of the Commonwealth; and an organization chart that appears in the record. To be more specific, the particular matters that are undisputed and determine the outcome of this appeal are the following:

1. The statute creating the PBA defines its duties as "provid[ing] lodging facilities for the schools, 'Health and Social Welfare Facilities', offices, quarters, courts, warehouses, shops and other physical facilities of the Commonwealth, any department,

agency, instrumentality or municipality." P.R.Laws Ann. tit. 22, § 903 (Supp.1983).

2. The itemization of positions of trust prepared by the PBA defines the PBA Regional Director's responsibilities as follows:

The Regional Directors have the responsibility for the administration, supervision, direction and inspection of the Authority's projects under construction. Therefore they coordinate, direct, supervise and inspect the activities comprised in all the construction cycle in [their] Region. Offer technical advise [sic] to the engineers in charge of the different projects. Are also responsible for the administration, supervision and direction of the maintenance and conservation services for the Authority's buildings in [their] region. The supervision phase also includes the service of contracts executed with other agencies and the Authority's Government Centers, as well as those which the Authority carries out with private companies. They also certify their payment. Also offer technical advise [sic] to the Auxiliary Executive Director in regards to the construction and conservation programs for the Authority's buildings in their respective regions. Are the official representatives of the Authority and its Executive Director in their regions in regards to the relationship to be established with municipal officers, other Government representatives and the general public.

Record Appendix at 7.

3. The classification questionnaire states that the Regional Director supervises 54 employees including two building administrators, two conservation supervisors, four clerical personnel employees, nine conservation technicians, and 37 conservation workers. Classification Questionnaire, Record Appendix at 11. It describes the Director's duties as follows:

Supervision and coordination of all work to be done in the conservation and maintenance phases of all of the buildings in the region (32 buildings).

Direct and supervise the administrative tasks of the region in its phases of personnel relations, clerical work, requisitions and adquisition [sic] of materials and equipment, ect. [sic].

Carry out any other related duty that is requested....

Prepare the functional yearly budget based on the existing needs in the region for the revision by the Conservation Department and final approval by the Administration Office and any other periodic report that may arise.

Record Appendix at 10.

4. The table of organization shows the regional offices under the "Auxiliary Executive Director for Operations Area" who, in turn, reports to the Office of Executive Director, which is, in turn, responsible to the Board of Directors.

These facts indicate that the agency's mission is of a sort that might well involve the agency in the political process. Its duties, at the least, include responsibility for care and maintenance of public buildings throughout Puerto Rico, including schools, health facilities, and welfare facilities. Its responsibilities include not only custodial type work, but also the repair, reconstruction, and conservation of buildings. Where, how, and when the government will repair or reconstruct public buidings, which towns will have which priorities, when and where money is to be spent, may well be a matter of considerable interest to government officials including political leaders. Thus, the agency's mission is at least *"potentially"* one that concerns politically charged issues; and the job of an upper-level general manager is *"potentially"* concerned with what *"potentially"* concerns the agency's mission.

Similarly, there is at least a *"modicum"* of "policymaking responsibility" in the Regional Director's job within the agency on subjects that could involve political issues. He supervises 54 others; his is a moderately high-level position within the agency; he directs the "Authority's projects under construction"; he is the "official representative[]" of the "Authority and its Executive Director" in the region "in regards to relations with municipal officers, other Government representatives and the general public." He prepares a budget for the region,

a matter likely to be of considerable interest to the elected and other government officials who work there.

These factors, at least *"potentially"* make the Regional Director's job significantly different in respect to political involvement from those that courts have held constitutionally protected, i.e., road grader, city court bailiff, bookkeeper, deputy court clerk, deputy sheriff, supervisor of a branch of an auditor's office, *see* Appendix, waiters, cleaning people, and a director of domestic services, *see Vazquez Rios, supra.* The enumerated factors make the job somewhat more like those in which we have held "qualified immunity" exists. *Roure v. Hernandez Colon, supra* (translator); *Quintana v. Anselmi, supra* (Regional Director for Right to Employment Administration); *Raffucci Alvarado v. Sonia Zayas, supra* (Social Services Secretary); *Vazquez Rios v. Hernandez Colon, supra* (editing assistant in governor's press office; Executive Secretary in Office of Cultural Affairs); *Rosado v. Zayas, supra* (Regional Director, Department of Social Services; Director of Bureau of Statistics, Economic and Social Planning Program of Planning Board; Director of Bureau for Consultation on Land Use, Physical Planning Program of Planning Board); *Mendez-Palou v. Rohena-Betancourt, supra* (Director of Administration for Environmental Quality Board; Assistant Secretary for Special Services, Department of Agriculture; Deputy Executive Director for Special Affairs, Aqueduct and Sewer Authority); *Monge-Vazquez v. Rohena-Betancourt, supra* (Director of Office of Education and Community Relations, Environmental Quality Board; Regional Director, Department of Natural Resources); *Rodriguez Rodriguez v. Munoz Munoz, supra* (Regional Director of Right to Work Administration); *De Abadia v. Izquierdo Mora, supra* (Executive Director of Quality Control Program); *cf. De Choudens,* 801 F.2d at 10 (no abuse of discretion to grant *preliminary injunction* where evidence shows job is "essentially a provider of accounting services and technical, financial information" (quoting district court) but this court recognizes "closeness of a case involving the political firing of a top policy-making official").

▪ Since the undisputed job descriptions indicate a job that at least "potentially" concerned matters of partisan political interest and involved at least a "modicum" of policymaking responsibility, the defendant is entitled to "qualified immunity". *Mendez-Palou,* 813 F.2d at 1259. As we previously pointed out, however, we express no view about whether this position of "Regional Director" (after trial in respect to reinstatement) will turn out to fall outside, or within, *Elrod/Branti's* exception. The judgment of the district court in respect to the issue of qualified immunity is

*Reversed.*

## APPENDIX

The cases in which the courts have held there is constitutional protection include: *Meeks v. Grimes,* 779 F.2d 417 (7th Cir. 1985) (city court bailiff); *Horton v. Taylor,* 767 F.2d 471 (8th Cir.1985) (road grader); *Grossart v. Dinaso,* 758 F.2d 1221 (7th Cir.1985) (bookkeeper); *Barnes v. Bosley,* 745 F.2d 501 (8th Cir.1984) (deputy court clerk), *cert. denied,* 471 U.S. 1017, 105 S.Ct. 2022, 85 L.Ed.2d 303 (1985); *Jones v. Dodson,* 727 F.2d 1329 (4th Cir.1984) (deputy sheriff); *DeLaCruz v. Pruitt,* 590 F.Supp. 1296 (N.D.Ind.1984) (supervisor of branch of auditor's office).

The cases in which the courts have found no constitutional protection (as of 1985) include: *Brown v. Trench,* 787 F.2d 167 (3d Cir.1986) (county's assistant director of public information); *Tomczak v. City of Chicago,* 765 F.2d 633 (7th Cir.) (first deputy commissioner of department of water), *cert. denied,* 474 U.S. 946, 106 S.Ct. 313, 88 L.Ed.2d 289 (1985); *Shakman v. Democratic Organization of Cook County,* 722 F.2d 1307 (7th Cir.) (superintendent of employment for Chicago park district), *cert. denied,* 464 U.S. 916, 104 S.Ct. 279, 78 L.Ed.2d 258 (1983); *Livas v. Petka,* 711 F.2d 798 (7th Cir.1983) (assistant state's attorney); *Mummau v. Ranck,* 687 F.2d 9 (3d Cir.1982) (per curiam) (assistant district

attorney); *Sweeney v. Bond,* 669 F.2d 542 (8th Cir.) (fee agents), *cert. denied,* 459 U.S. 878, 103 S.Ct. 174, 74 L.Ed.2d 143 (1982); *Ness v. Marshall,* 660 F.2d 517 (3d Cir.1981) (city solicitor and assistant solicitor); *Nekolny v. Painter,* 653 F.2d 1164 (7th Cir.1981) (question of fact whether senior citizens' coordinator was policymaker), *cert. denied,* 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 139 (1982); *Committee to Protect the First Amendment Rights of Employees of the Department of Agriculture v. Bergland,* 626 F.2d 875 (D.C.Cir. 1979) (state directors of Farmers Home Administration, state executive directors of Agricultural Stabilization and Conservation Service) (pre-Branti), *cert. denied,* 447 U.S. 921, 100 S.Ct. 3012, 65 L.Ed.2d 1113 (1980); *Ecker v. Cohalan,* 542 F.Supp. 896 (E.D.N. Y.1982) (deputy park commissioner); *Brunton v. United States,* 518 F.Supp. 223 (S.D. Ohio 1981) (state director of Farmers Home Administration).

TORRUELLA, Circuit Judge (dissenting).

I continue to adhere by my views expressed in *Pérez Quintana v. Gracia Anselmi,* 817 F.2d 891, 893 (1st Cir.1987) (dissenting); *Rosado v. Zayas,* 813 F.2d 1263, 1267 (1st Cir.1987) (same); and in *Jiménez Fuentes v. Torres Gaztambide,* 807 F.2d 236, 248 (1st Cir.1986), *cert. denied,* — U.S. ——, 107 S.Ct. 1888, 95 L.Ed.2d 496 (1987) (same).

The majority finds today that the function of the Public Buildings Authority ("PBA") is "at least potentially" one that concerns partisan politics, and that the job of Regional Director involves "at least a modicum of policy making responsibility." Because the majority concludes that plaintiff's discharge in 1985 did not violate "clearly established" law, defendant is immune from a Section 1983 damages action. *See ante* at 13, quoting *Méndez-Palou,* 813 F.2d at 1259 (a defendant enjoys qualified immunity unless it was clearly established that employees in the *particular position* at issue ... were constitutionally protected).

I have objected before that this watered-down version of *Branti* creates a "dragnet from which no governmental position can escape," precisely because "[p]oliticians can *potentially* disagree on anything and everything." *Rosado,* 813 F.2d at 1268. As applied, this ad-hoc non-standard suggests that the law is unsettled until the position itself, that is, Regional Director of the PBA for the Aguadilla Region, has been litigated before the *federal* courts. Even this court has been unwilling to go that far in other civil rights cases. In fact the Supreme Court recently ruled otherwise. *See Anderson v. Creighton,* — U.S. ——, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Hall v. Ochs,* 817 F.2d 920 (1st Cir.1987). In *Anderson* the Court, in particularizing the meaning of "clearly established" law, found:

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but is to say that in the light of preexisting law the unlawfulness must be apparent.

— U.S. at ——, 107 S.Ct. at 3039.

Of course, if it was "clearly established" at the time that certain *domestic* employees performing ministerial duties could not be fired for political reasons, *Vázquez Ríos v. Hernández Colón,* 815 F.2d 830 (1st Cir.1987), the illegality of the discharge in this case, too, should have been *apparent* in 1985. The PBA's main function is to maintain and to renovate the public infrastructure. The agency is analogous to a janitorial service company in the private sector whose functions do not stimulate political discord. And the defendant has not met the burden of proving that the Regional Director position, as manager of Puerto Rico's public janitors, is one requiring political affiliation for its effective performance. The uncontroverted facts upon which the majority relies show that the Regional Director offers "technical advice" in regards to the construction and conservation of projects within the region and

oversees the execution of contracts with other government agencies. *See ante* at 15. Regardless of his bombastic title and minimal supervisory responsibilities, the duties of this job are measured strictly by technical or professional criteria, much like the administrative technocrat in *de Choudens v. Government Development Bank,* 801 F.2d 5 (1st Cir.1986), *cert. denied,* — U.S. ——, 107 S.Ct. 1886, 95 L.Ed.2d 494 (1987), for whom no party affiliation is prescribed. When I compare the work performed by the present appellant with that in *de Choudens* in which we refused to allow partisan political considerations to prevail as applied to a senior vice-president of the Government Development Bank, I cannot but conclude that we are but one small step away from openly reversing not only that decision but also *Branti.*

I respectfully dissent.