NOT FOR PUBLICATION

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | | |
|---|---|---|
| In re: | ) | BAP No. OR-11-1191-ClPaJu |
| | ) | |
| RICHARD DEAN CARTER, | ) | Bk. No. 10-30555-tmb7 |
| | ) | |
| Debtor. | ) | Adv. No. 10-03136-tmb |
| _____ | ) | |
| | ) | |
| RICHARD DEAN CARTER, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | **M E M O R A N D U M**[1] |
| | ) | |
| UNITED STATES | ) | |
| DEPARTMENT OF EDUCATION, | ) | |
| | ) | |
| Appellee. | ) | |
| _____ | ) | |

Argued and Submitted on October 20, 2011
at Portland, Oregon

Filed - November 8, 2011

Appeal from the United States Bankruptcy Court
for the District of Oregon

Honorable Trish M. Brown, Bankruptcy Judge, Presiding

_____

Appearances:    Donald H. Grim, Esq. of Greene & Markley, P.C.
argued for Appellant Richard Dean Carter
Sean E. Martin, Esq., Assistant United States
Attorney, argued for Appellee United States
Department of Education

_____

Before: Clarkson[2], Pappas and Jury, Bankruptcy Judges.

_____

[1]   This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8013-1.

[2]   Hon. Scott C. Clarkson, United States Bankruptcy Judge for the Central District of California, sitting by designation.

-1-

This appeal arises from the bankruptcy court's judgment denying Chapter 7 debtor and appellant Richard Carter's ("Carter" or "Debtor") request that his student loans, in the current amount of approximately $26,000.00, be discharged pursuant to 11 U.S.C. §523(a)(8).[3]

The Debtor has a compelling personal story consisting of several decades of substance abuse, related crimes and punishments, the eventual recovery from that dark abyss, and his reentry as a productive member of mainstream society. For the past seven years, the Debtor has been steadily employed and currently holds a position as a service station manager at a gas station in the Portland, Oregon area.

Filing his chapter 7 petition on January 26, 2010, and thereafter commencing his adversary proceeding, the Debtor asserted that, based upon his current income and living expenses, he was unable to pay his student loans and maintain a minimal standard of living. After trial, and with sympathetic acknowledgment of the Debtor's destructive past and remarkable recovery, the bankruptcy court determined that the Debtor had a current ability to repay his student loans under the government administered Income Contingent Repayment Plan and at the same time continue to maintain a minimal standard of living. Thus, the bankruptcy court concluded that the Debtor's student loans could not be discharged. For the reasons discussed below, we AFFIRM the bankruptcy court's judgment.

---

[3] Absent contrary indication, all section and chapter references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532.

## I.    FACTS

### a.    Pre-Bankruptcy Events

Carter is fifty years old and has no dependents.  In 1991, Carter graduated from ITT Technical Institute in Portland, Oregon with an Associate of Applied Science, Electronics Engineering Technology Degree, and in 1992, he received his Bachelor of Applied Science Degree in Automated Manufacturing Technology. Between 1989 and 1992, Carter originally financed his education through two student loans.  In April 2003, Carter consolidated these student loans (the "Consolidated Loan"), which resulted in a principal amount of $21,122.19, with an interest rate of 4.5%. Prior to consolidating his student loans, Carter had made no payments on either, and his student loans were in default.

Commencing before his education at ITT, Carter used and became addicted to various illicit substances.  This use continued until approximately January, 2004.  Carter also engaged in criminal activities associated with his drug addiction, including selling drugs.  As a result of those activities Carter was arrested and imprisoned on many occasions.

From August 1992 to March 2003, Carter worked as an electronics technician, and from March 1999 to 2004, Carter obtained a second job as a field service technician.  From 1999 to 2004, he was earning between $10.00 and $15.00 per hour performing field technical services.

In January 2004, Carter entered into a six month

///

///

///

-3-

rehabilitation program,[4] and in June 2004, completed his treatment and moved into the Oxford House.[5]

After completing his treatment, Carter worked part-time at a furniture manufacturing company and in December 2004, commenced working for his present employer, WSCO Petroleum. Clean and sober, Carter advanced from a part-time employee to a full-time employee, then to an assistant manager and finally became a service station manager. Carter's commute to work is approximately twenty miles each way.

The Trial record is clear that as a service station manager, Carter receives $9.00 per hour, periodic bonuses based on performance of his service station, vacation benefits, health benefits, and overtime pay. Carter's monthly bonuses are based upon unit sales of gasoline and cigarettes. However, Carter is also financially liable for any and all cash shortages, and if inventory is short, it results in a reduction of his monthly bonus. Interestingly, any overtime (time in excess of forty hours per week) that Carter or any of his employees work is deducted from Carter's monthly bonus. As Carter describes the situation, he basically pays himself to work overtime.

Beginning in 2003, Carter's monthly payment on the Consolidated Loan was $78.25 under the Income-Contingent Repayment ///

---

[4] The Volunteers of America Men's Rehabilitation Center is a publicly funded drug addiction treatment center.

[5] The Oxford House is a publicly funded, non-profit low-cost housing alternative for recovering alcoholics and drug addicts. Carter stayed at the Oxford House until December 2008.

-4-

Plan ("ICRP") program.[6] Following the consolidation in April 2003, Carter failed to make any payments on the Consolidated Loan and in September 2004, the Department of Education ("DOE") declared his loan in default. On December 14, 2005, Carter submitted to DOE an offer to settle the Consolidated Loan for $1,000.00, which was rejected, and on January 6, 2006, Carter offered to commence paying $25.00 per month on the Consolidated Loan. He made a single payment of $25.00. On July 18, 2006, Carter renewed his offer to settle the Consolidated Loan for $1,000.00, which was also rejected. No further payments on the Consolidated Loan were made until June 15, 2009, when eight consecutive monthly payments were made, each in the amount of $230.00.[7]

### b. Procedural History

On January 26, 2010, Carter filed a voluntary chapter 7 petition, and on May 5, 2010, Carter filed a complaint initiating an adversary proceeding against DOE to determine the dischargeability of the Consolidated Loan under § 523(a)(8) (the "Complaint"). Carter alleged that excepting the student loans from discharge would impose an undue hardship on him.

---

[6] The Income Contingent Repayment (ICRP) Plan is designed to make repaying education loans easier for students who intend to pursue jobs with lower salaries, such as careers in public service. It does this by pegging the monthly payments to the borrower's income, family size, and total amount borrowed. The monthly payment amount is adjusted annually, based on changes in annual income and family size. Income-contingent repayment is currently available only from the U.S. Department of Education.

[7] While the parties' stipulation (ER p. 13) states that seven payments were made, a review of the record demonstrates that eight payments were actually made. Carter made monthly payments in the amount of $230.00 from June 15, 2009 to January 1, 2010.

On June 9, 2010, DOE filed its answer (the "Answer") which further contained a counterclaim against Carter, alleging that Carter is indebted on the Consolidated Loan in the principal amount of $20,866.12, plus interest of $4,915.80, for a total of $25,781.92 and interest continues to accrue at a daily rate of $2.57, and that the DOE had received $1,865.00 in payments on the loan. DOE's counterclaim further alleged that the Consolidated Loan was not dischargeable and non-discharge of Carter's student loan would not create an undue hardship on Plaintiff.

On March 31, 2011, the bankruptcy court conducted trial, taking testimony from Carter regarding, *inter alia*, his income and expenses. Carter testified that (1) his transportation costs had increased, (2) his utilities had increased, (3) he has forgone certain medical procedures because he does not have the available funds, (4) his car insurance premium was $148.00 per month, (5) he estimated that a reasonably reliable car would cost approximately $346.00 per month, and (6) he anticipated a decrease in earnings of approximately $100.00 to $200.00 per month because of slower business at the station. Also, Carter testified that he is in line for a promotion to work at another store which is closer to his home in The Dalles.

Carter testified regarding his current health condition that he suffers from right foot tremor disorder, Hepatitis C, and chronic fatigue syndrome.

The bankruptcy court also took testimony from Carter's witness, Clariner Boston. Ms. Boston testified that, considering Carter's background, legal history, previous drug abuse, and education, it would be "highly improbable" within a short amount

-6-

of time for him to obtain an alternative better and more lucrative position. Ms. Boston testified that "given everything that we know about his background, that considering his own disposition, and given the competitiveness out there of people looking for jobs, I think it's great that he's doing everything that he can to hold onto his position because if he lost it, he even in The Dalles would have to stand in line, and I don't know if he could get something that would be as lucrative as this has been for him, and that's even in a limited way."

The bankruptcy court further took testimony from DOE's witness, Sheryl Davis, who testified that based on Carter's Adjusted Gross Income of $35,500.00, his monthly payment on the Consolidated Loan under the ICRP would be $203.98 per month.

The bankruptcy court, instructed by the Ninth Circuit case United Aid Funds v. Pena (In re Pena), 155 F.3d 1108, 110 (9th Cir. 1998), identified and applied the three factors set forth under the Brunner test to determine "undue hardship" under § 523(a)(8). Brunner v. N.Y. State Higher Educ. Services, Corp. (In re Brunner), 831 F.2d 396 (2d Cir. 1987). The bankruptcy court made the following findings with respect to the first prong of the Brunner test:

> So I — so I'm going to find that [Carter] can make payments under the income-contingent repayment plans, so he doesn't meet the first criteria under the Brunner test...I think he does have an ability to — a current ability to pay under the ICRP, so I'm finding against the debtor on the first prong of the Brunner test. I know it's tight, but I mean the budget that he filed with the Bankruptcy Court showed that he could make $230 a month payments.

Transcript, 31 March 2011, pages 98-99.

With respect to the second prong of the Brunner test, the

-7-

bankruptcy court found, "And I don't find that in the future – I mean, if he has that ability to for the next 15 years, he has the ability to pay, so I don't think – I understand it's going to be difficult, and I understand what I'm telling you."  Id. at 99-100.

As to the third prong of the Brunner test, the bankruptcy court found, "With respect to good faith, though, I think he probably did make good faith efforts to pay once he started making payments.  I can't find that he didn't, so I can't find with respect to the third prong of the Brunner test."  Id. at 100.

The bankruptcy court found that Carter could not satisfy all three prongs of the Brunner test.  Apparently addressing DOE's counsel, the bankruptcy court said, "[Y]ou win on the first two, and (apparently addressing Carter's counsel) you have to win on all three in order to – Mr. Greene would have had to win on all three."  Id. at 100.  Accordingly, on April 12, 2011, the bankruptcy court entered a judgment in favor of DOE (the "Judgment").  At the same time, the bankruptcy court reinstated Carter's loan to a non default status and re-enrolled Carter into the ICRP program.[8]

Carter timely filed this appeal asserting that the bankruptcy court erred in (1) holding that the Consolidated Loan did not impose an undue hardship, and (2) not performing "an

---

[8]  The final Judgment provides that (1) pursuant to 11 U.S.C. § 523(a)(8) the student loan owed by Carter to the DOE was not discharged; (2) as of March 31, 2011, Carter's loan balance was $20,866.12 in principal, plus $5,742.22 in interest; (3) the DOE shall deem Carter not to be in default, recall his loan, and re-enroll him in the ICRP program; (4) If Carter's loan remains in good standing, including deferrals and forbearances all debt remaining when Carter turns 65 years of age shall be considered discharged in this bankruptcy proceeding pursuant to Title 11; and (5) the parties shall bear their own costs and fees.  ER p. 261.

-8-

individualized analysis" to determine Carter's necessary expenses, but instead applying a mechanical test relying on the National Poverty Guidelines and DOE's ICRP.

## II. JURISDICTION

The bankruptcy court had jurisdiction via 28 U.S.C. § 1334 and § 157(b)(1) and (b)(2)(I), and we do so under 28 U.S.C. § 158(c).

## III. ISSUES

Whether the bankruptcy court erred in:

1. its findings regarding undue hardship; and

2. in relying on the National Poverty Guidelines and the IRCP under the first prong of the Brunner test.

## IV. STANDARDS OF REVIEW

We review the bankruptcy court's finding of fact for clear error. In re Pena, 155 F.3d at 1110. "Where there are two permissible views of evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson v. City of Bessemer City, N.C., 470 U.S. 564 (1985). We review de novo the bankruptcy court's application of the legal standard to decide whether a student loan debt is dischargeable as an undue hardship. Pa. Higher Educ. Assistance Agency v. Birrane (In re Birrane), 287 B.R. 490 (9th Cir. BAP 2002).

## V. DISCUSSION

### a. Carter's Request for Judicial Notice

Carter requests that we take judicial notice of the IRS National Standards for a single person living in Hood River, Oregon. DOE objects to Carter's request for judicial notice because this evidence was not brought before the bankruptcy court.

-9-

Save in unusual circumstances, an appellate court can only consider the record on appeal. See Barilla v. Ervin, 886 F.2d 1514, 1521 n.7 (9th Cir. 1989). There are exceptions to the general rule. For instance, we may correct inadvertent omissions from the record (See Fed. R. App P. 10(e)(2)(C)), and we may take judicial notice (See Fed. R. Evid. 201(f); EEOC v. Ratliff, 906 F.2d 1314, 1318 n.6 (9th Cir. 1990)).

We must first determine why Carter requests that we take judicial notice of the IRS National Standards for a single person living in Hood River, Oregon. It appears that Carter wants us to notice that his living expenses are lower than the IRS National Standards. From this observation, Carter wants us to determine that the bankruptcy court inappropriately analyzed his income and expense. He would ask that we find that his living expenses are reasonable (that they are approximately $66.00 a month less than the local National Standards, not including his medical expenses and telephone and internet access cost) and that his living expenses are simply more than his income. Therefore, he argues that the bankruptcy court incorrectly determined that he could maintain a minimal standard of living and repay the student loans.

We may not take Carter's request to take judicial notice for purposes of reviewing the bankruptcy court's factual findings for clear error, especially since this information was not before the bankruptcy court. It is inappropriate to use judicial notice to cure failure to present relevant evidence to trial courts. Yagman v. Republic Ins. Co., 987 F.2d 622, 626 fn. 3 (9th Cir. 1993). Therefore, Carter's request for judicial notice is DENIED.

**b.    Dischargeability of student loans under § 523(a)(8)**

A debtor may not discharge government-funded or guaranteed student loans "unless excepting such debt from discharge . . . will impose an undue hardship on the debtor and the debtor's dependents[,]"  § 523(a)(8), which is further explained in In re Nys:

> Congress' main purpose in enacting the bankruptcy code was to ensure insolvent debtors a fresh start by discharging prepetition debts.  However, under § 523(a)(8), there is a presumption that educational loans extended by or with the aid of a governmental unit or nonprofit institution are nondischargeable in bankruptcy in the absence of undue hardship to the debtor or the debtor's dependents.  This law furthers congressional policy to ensure that such loans, extended solely on the basis of the student's future earnings potential, cannot be discharged by recent graduates who then pocket all of the future benefits derived from their education.
>
> The Debtor bears the burden to prove by a preponderance of the evidence that he or she is entitled to a discharge of the student loan.
>
> Neither the code nor the legislative history for § 523(a)(8) defines "undue hardship," but case law has held that it is something more than "garden-variety hardship" Pena, 155 F.3d at 111.  Cases involving "real and sustained" hardship may merit discharge.

Nys v. Educ. Credit Mgmt. Corp. (In re Nys), 308 B.R. 436 (9th Cir. BAP 2004) (some citations omitted).

**The Brunner Test**

The Ninth Circuit has adopted a three-part test to determine "undue hardship":

> First, the debtor must establish "that she cannot maintain, based on current income and expenses, a 'minimal' standard of living for herself and her dependants if forced to repay the loans. . . ."
>
> Second, the debtor must show "that additional circumstances exist indicating that this state of affairs is likely to persist for a

-11-

> significant portion of the repayment period of the student loans. . . ."
>
> The third prong requires "that the debtor has made a good faith effort to repay the loan . . . ." Pena, 155 F.3d at 1111 (quoting Brunner, 831 F.2d at 396).
>
> Debtor must satisfy all three parts of the Brunner test before her student loans can be discharged. See Saxman v. Educ. Credit Mgmt. Corp. (In re Saxman), 325 F.3d 1168, 1173 (9th Cir. 2003). Failure to prove any of the three prongs will defeat a debtor's case.

In re Nys, 308 B.R. at 441-42.

### i. Minimal Standard of Living

The first prong of the Brunner test requires a debtor to prove "that the debtor cannot maintain, based on current income and expenses, a 'minimal' standard of living for herself and her dependants if forced to repay the loans." In re Brunner, 831 F.2d at 396.

> To meet this requirement, the debtor must demonstrate more than simply tight finances. In re Nascimento, 241 B.R. 440, 445 (9th Cir. BAP 1999). "In defining undue hardship, courts require more than temporary financial adversity, but typically stop short of utter hopelessness." Id.

Rifino v. United States (In re Rifino), 245 F.3d 1083 (9th Cir. 2001).

The "minimal standard of living" must be determined "in light of the particular facts of each case." Cota v. U.S. Dep't of Educ. (In re Cota), 298 B.R. 408, 415 (Bankr. D. Ariz. 2003) (quoting In re Afflitto, 273 B.R. 162, 170 (Bankr. W.D. Tenn. 2001)). We have held that the IRS standards for living may be considered as evidence in evaluating the first prong of the Brunner test, but it should not be the sole measure of what is

-12-

necessary to maintain a minimal standard of living. Educ. Credit Mgmt. Corp. v. Howe (In re Howe), 319 B.R. 886, 892 (9th Cir. BAP 2004). "The method for calculating a debtor's average monthly expenses is a matter properly left to the discretion of the bankruptcy court." In re Pena, 155 F.3d at 1112.

Carter argues that the bankruptcy court committed error because it did not perform an individualized analysis of his income with a mechanical application of the Poverty Guidelines and the ICRP. Specifically Carter argues the bankruptcy court erred in finding that because his income was above the National Poverty Guidelines he qualified for the ICRP, and because he qualified for the ICRP, he did not meet the first prong under the Brunner test.[9] However, a review of the record indicates that the bankruptcy court was given significant evidence to consider and evaluate the first prong of the Brunner test.

Further, Carter argues that the bankruptcy court failed to perform an individualized analysis of his necessary expenses. However, the record reflects that the bankruptcy court received considerable evidence from Carter regarding his income and expenses. Prior to trial, Carter and DOE stipulated that Carter's average monthly net income on his Bankruptcy Schedule I, after payroll deductions, was approximately $2,357.00, and his necessary expenses, as listed on Schedule J, were $2,361.00 per month. (Carter's Schedule J included a $230 monthly payment on the

---

[9] Carter argues that the bankruptcy court held that because Carter's income was above the National Poverty Guidelines and he qualified for reduced payments under the ICRP, he may not discharge his student loan. However, Carter's argument is not supported by the record.

-13-

Consolidated Loan.) Prior to trial, the parties also stipulated that there had been no significant changes in Carter's financial situation since the bankruptcy petition date.

At trial, the bankruptcy court took evidence consisting of (1) Carter's Schedules I and J, (2) Carter's post petition changes to his income and expenses, (3) the testimony of Ms. Boston regarding Carter's ability to find other employment, and (4) the testimony of Ms. Davis regarding Carter's payment on the Consolidated Loan under the ICRP. The bankruptcy court's ruling with respect to the first prong references Carter's schedules filed in connection with his bankruptcy: ". . . the budget that [Carter] filed with the Bankruptcy Court showed that he could make $230 a month payments." Transcript, 31 March 2011, page 99. Thus the record reflects that the bankruptcy court did not mechanically apply the Poverty Guidelines and the ICRP, but conducted an individualized analysis of Carter's income and expenses.

We conclude, therefore, that the bankruptcy court did not commit clear error in finding that Carter failed to meet the first prong of the Brunner test.[10]

            ii. Persistent Additional Circumstances

The second prong of the Brunner test requires a debtor to prove "that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans." In re Brunner,

---

[10] The bankruptcy court was not technically required to examine the second or third prongs of the Brunner test. See In re Birrane, 287 B.R. 490, 496 (9th Cir. BAP 2002) (citing In re Roberson, 999 F.2d 1132, 1135 (7th Cir. 1993) (Only if the Debtor meets the first prong of the Brunner test should a court examine the other two Brunner requirements.).

-14-

831 F.2d at 396. The debtor must provide evidence that he or she will be unable to repay for several years, because of psychiatric problems, lack of useable job skills, severely limited education, physical problems, or any other circumstances which will persistently interfere with the debtor's ability to repay." In re Birrane, 287 B.R. at 497. See, also, In re Nys, 308 B.R. at 444-45.

We have held, based upon prior case law, that "additional circumstances" may include the following nonexhaustive list of factors: (1) serious mental or physical disability of the debtor or the debtor's dependents which prevents employment or advancement; (2) the debtor's obligations to care for dependents; (3) lack of, or severely limited, education; (4) poor quality of education; (5) lack of usable or marketable job skills; (6) underemployment; (7) maximized income potential in the chosen education field, and no other more lucrative job skills; (8) limited number of years remaining in work life to allow payment of the loan; (9) age or other factors that prevent retraining or relocation as a means for repayment of the loan; (10) lack of assets, whether or not exempt, which could be used to pay the loan; (11) potentially increasing expenses that outweigh any potential appreciation in the value of the debtor's assets and/or likely increases in the debtor's income; and (12) lack of better financial options. In re Nys, 308 B.R. at 446.

Both Carter and DOE argue that they prevailed on the second prong of the Brunner test. Carter's view that he prevailed resulted in his failure to specifically address the second prong in his appeal brief. However, a careful review of the record is

-15-

consistant with DOE's view that the bankruptcy court found against Carter on the second prong.

The hearing transcript clearly indicates that the bankruptcy court found against Carter as to the second prong. The bankruptcy court stated, ". . . I mean if he has that ability to pay for the next 15 years, he has the ability to pay, so I don't think. . . ." Transcript, 31 March 2011, page 99. Here, the bankruptcy court found that Carter had the ability to pay his student loans for the next 15 years and thus found against Carter under the second prong of the Brunner test.

The bankruptcy court took evidence regarding (1) Carter's age and education, (2) his previous drug and legal issues, (3) Carter's previous and current employment, (4) his growth and responsibilities at his current job, (5) his current physical condition, and (6) his prospects of finding another job near the Portland area. Carter did not provide any evidence that his current economic situation would change in the next several years which would prevent him from repaying his student loans. On the contrary, Carter presented evidence that he was next in line for a promotion which would result in some pay increase and a potential decrease in transportation expenses. Thus, the record indicates that Carter's current state of financial affairs (current ability to repay his student loan while maintaining a minimal standard of living) would persist for a significant portion of the repayment period. We conclude that the bankruptcy court did not commit clear error in finding that Carter did not meet the second prong of the Brunner test.

### iii. Good Faith Effort to Repay

The final prong of the <u>Brunner</u> test requires a debtor to prove "that the debtor has made a good faith effort to repay the loans." <u>In re Brunner</u>, 831 F.2d 396. Two common factors are considered in evaluating good faith. <u>In re Birrane</u>, 287 B.R. at 499-500. Those are the debtor's efforts (1) to obtain employment, maximize income, and minimize expenses, and (2) to negotiate a repayment plan. <u>Id.</u> The bankruptcy court found that Carter met his burden of the third prong of the <u>Brunner</u> test, and because Carter does not dispute the bankruptcy court's findings in his favor regarding good faith, we will not disturb them.

**VI. CONCLUSION**

The bankruptcy court's decision is amply supported by the record. Applying the <u>Brunner</u> test, the bankruptcy court did not commit clear error in finding that (1) Carter could maintain a minimal standard of living and repay the consolidated loan, and (2) Carter's financial situation was likely to continue for a substantial portion of the repayment period. Carter was unable to establish "undue hardship" within the meaning of § 523(a)(8) and was not entitled to a bankruptcy discharge of the Consolidated Loan.

For the reasons set forth above, we AFFIRM.

-17-